777 A.2d 950 (2001)
343 N.J. Super. 1
UNITED PROPERTY OWNERS ASSOCIATION OF BELMAR, Nicholas Zampetti, Laura Gifford and John Roland, Plaintiffs-Appellants,
v.
BOROUGH OF BELMAR, Kenneth Pringle, Mayor of the Borough of Belmar, Jack Manutti, Patricia Provenzano, Andrew Gallagher and Doug McGill, Council Members of the Borough of Belmar, Defendants-Respondents.
United Property Owners Association of Belmar, Nicholas Zampetti, Laura Gifford and John Roland, Plaintiffs-Respondents,
v.
Borough of Belmar, Kenneth Pringle, Mayor of the Borough of Belmar, Jack Manutti, Patricia Provenzano, Andrew Gallagher and Doug McGill, Council Members of the Borough of Belmar, Defendants-Appellants.
Nicholas M. Zampetti, Jr. and Mariann Zampetti, Plaintiffs-Appellants,
v.
Borough of Belmar, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 2001.
Decided July 16, 2001.
*955 Randy T. Pearce, argued the cause for appellants in No. A-2938-99T5 and respondents in No. A-2941-99T5 (Pearce Fleisig, attorneys, Hackensack; Mr. Pearce, of counsel and on the brief; Jennifer A. McAdam; Catherine A. Muldoon, Newark and Jennifer Brigliadoro, on the brief).
Andrew T. Fede, Hackensack, argued the cause for appellants in A-40-00T5 (Contant, Atkins, Rogers, Fede, Keane & Hille, attorneys; Mr. Fede, of counsel and on the brief).
Karl P. Kemm, North Brunswick, argued the cause for respondents in No. A-2938-99T5, appellants in No. A-2941-99T5 and respondent in No. A-40-00T5 (Philibosian, Russell, Killmurray & Kinneally, attorneys; Mr. Kemm, of counsel and on the brief).
Before Judges CARCHMAN, LINTNER and PARRILLO. *951 *952 *953
*954 The opinion of the court was delivered by CARCHMAN, J.A.D.
These three appeals require us to determine the validity of a comprehensive local ordinance governing summer rentals at a shore community. Plaintiffs United Property Owners Association of Belmar, an association of approximately eighty property owners in Belmar, and three of its constituent members Nicholas Zampetti, Laura Gifford and John Roland (collectively plaintiffs), brought an action against the Borough of Belmar, Kenneth Pringle, Mayor of Belmar, and Jack Manutti, Patricia Provenzano, Andrew Gallagher and Doug McGill, all members of the Borough Council (collectively "defendants" or "Belmar") seeking to invalidate the Belmar Ordinance 1999-16 (the Ordinance). After an extended trial, the judge voided certain *956 sections of the Ordinance and upheld others. Plaintiffs appeal, and defendants cross-appeal.
Plaintiffs contend on appeal that the judge erred in failing to invalidate the Ordinance provisions that: (1) limit occupancy for summer rentals only; (2) impose more restrictive fire regulations than required; (3) impose liability for occupancy violations on all tenants; (4) increase licensing fees; (5) prohibit exceeding the occupancy rate at night; and (6) restrict noise. Plaintiffs also claim selective enforcement; assert that the Ordinance constituted a taking or inverse condemnation; object to the judge's failure to invalidate the entire Ordinance instead of selected provisions; and contend that their attorneys' fee, awarded under the Federal Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C.A. งง 3601-3631 (the Act) was inadequate.
Defendants on their cross-appeal contend that the judge erred in invalidating those sections of the Ordinance that: (1) require that when a unit is rented to a family with a school-aged child over the winter, the summer rental cannot begin until the end of the spring term of the school year; (2) compel the submission of information regarding tenants on applications for certification; (3) prohibit temporary certifications; (4) proscribe the use of flammable materials as partitions; and (5) prohibit commercial signs and strings of lights.
The trial judge, in a well-reasoned and thoughtful written opinion, upheld the validity of the Ordinance, including a prohibition on the presence of the number of occupants during certain hours, but determined that certain provisions were invalid. We conclude that the trial judge correctly determined the Ordinance was constitutional, was not selectively enforced, properly imposed liability on all tenants for occupancy violations, did not constitute a taking, did not impose punitive fees, and did violate the Act. We further conclude that the judge's award of attorney's fees pursuant to the Act was not inadequate.
We determine, however, that the judge erred in declaring certain provisions of the Ordinance invalid, including the portions of the Ordinance that prohibit: (1) temporary certificates of inspection for summer rentals; (2) the use of flammable materials as partitions; and (3) commercial signs and strings of lights on summer rentals.
A companion appeal (A-40-00T5) filed on behalf of plaintiffs Nicholas M. Zampetti, Jr. and Mariann Zampetti (Zampettis) against defendant Borough of Belmar challenges the imposition of a bond on landlords for multiple convictions of tenants for disorderly conduct, as well as the factual determination as to the necessity of a bond (the Zampetti appeal). Since we address the issue of a bond in the context of plaintiffs' omnibus challenge to the validity of the Ordinance, we consolidate the appeals for purposes of this opinion and determine the Zampetti appeal here as well. We conclude that the bond requirement is valid and affirm the judgment upholding the validity of that provision.

I.
The genesis of the Ordinance is set forth in the legislative findings incorporated in the Ordinance. According to these findings, Belmar is a one-square-mile resort community with a year-round population of approximately 6,000 residents, which experiences an enormous influx of visitors each summer, many of whom seek to rent temporary accommodations while continuing to maintain a permanent residence elsewhere. As of the summer of 1998, Belmar had approximately 550 of such rental units *957 that met the definition set forth in N.J.S.A. 40:52-1(n).[1]
The legislative findings continue that, because of a great demand for seasonal rentals, they are frequently overcrowded, resulting in unsafe conditions including occupants sleeping in basements, blocking of doors as well as intentionally disabled smoke alarms, construction of partitions made of flammable materials, and "stockpil[ing of] garbage in basements and closets."
The findings conclude that "[s]easonal rental accommodations in Belmar are also frequently detrimental to the health, safety, welfare and quality of life of other nearby residents and visitors." Problems include "excessive noise, unruly behavior, obscene language, fighting, littering, parking of vehicles on lawns, public urination, poor maintenance of the property and grounds, and violation of trash collection ordinances." Belmar Ordinance 1999-16, ง 26-7.1E.
After extolling the progress of Belmar in recent years, Mayor Pringle announced the proposed Ordinance in September 1998, commenting that "[t]he only dark cloud on Belmar's horizon is our 560 summer rentals" which have a negative "impact on our property values, our taxes, our school system and our quality of life." Much of Pringle's commentary was based on anecdotal information, but clearly the issue of summer rentals had been the topic of debate and notice for years in the Belmar community. He acknowledged the general problem of unruly behavior, obscene language, public urination and ongoing chronic problems of tenants living with beds on floors, in basements, in makeshift lofts, and "mattresses spread from one end of the room to another."
Pringle's observations and perceptions were supported by substantive information including data presented by the zoning officer describing nine people sleeping in a seventy square foot room in three layers of stacked plywood, fourteen people living in a house with an occupancy limit of four, and a general conclusion that eight out of every ten summer rentals were overcrowded. Others described cars parked on lawns, people sleeping in cars, bottles and other debris littering rental properties and people "totally out of control."
Plaintiffs challenged these observations claiming that the Borough was "heavyhanded" and trying to "beat the property owners" out of the summer rental business. Plaintiffs also claimed that yearround rentals received more favorable treatment than summer rentals, and asserted "selective enforcement" of relevant codes and ordinances.
Plaintiffs filed a complaint in the Law Division challenging then Belmar Ordinance 1998-16 (Sept. 9, 1998), as being so pervasively restrictive that it denied plaintiffs the right to use their properties as seasonal rentals. Plaintiffs' complaint included allegations that: (1) different regulations applicable to short-term and longterm rentals violated equal protection; (2) the fees imposed were excessive; and (3) regulation based on occupancy of schoolaged children violated the Act.
Following the issuance of injunctive relief enjoining enforcement of that ordinance pending final disposition and, in response to this litigation, Belmar promulgated the Ordinance which amended Ordinance 1998-16 and which is the subject of this appeal.

*958 II.

In considering the positions of the parties, certain bedrock principles of appellate review apply. The trial judge's findings of fact "are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Township Committee of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995).
With these considerations in mind, we now address plaintiffs' specific claims. Plaintiffs contend that the judge erred in failing to find that the occupancy limitation of Ordinance section 26-7.4 discriminates against summer rentals in violation of the equal protection guarantees of the United States and New Jersey Constitutions. Plaintiffs object to defendants' application of the occupancy restriction to summer rentals only and assert that the occupancy restriction has no rational relation to the Borough's problems, because defendants failed to prove that overcrowding or other problems emanate from summer rentals. Plaintiffs also argue that defendants incorrectly calculated occupancy by allowing only bedrooms to be used for sleeping.
Defendants counter that their method of calculation was correct, that they applied the occupancy restriction to all properties, and that the Ordinance was rationally related to protecting the welfare of summer tenants and the community.
Ordinance section 26-7.4(a) provides: "Each Summer Rental License shall state thereon the maximum permitted occupancy of the dwelling unit as calculated by the Code Official pursuant to and in accordance with PM-405." PM-405 refers to The BOCA (Building Officials & Code Administrators International, Inc.) National Property Maintenance Code (4th ed. 1993) (BOCA Code). The BOCA Code sets forth the minimum area required for a dwelling unit's living room, dining room, and kitchen, depending on the number of occupants. PM-405.5. The BOCA Code also provides:
PM-405.3 Area for sleeping purposes:
Every room occupied for sleeping purposes by one occupant shall contain at least 70 square feet (70 m2) of floor area, and every room occupied for sleeping purposes by more than one person shall contain at least 50 square feet (50 m2) of floor area for each occupant thereof.

....
PM 405.7 Prohibited occupancy:
Kitchens, nonhabitable spaces and interior public areas shall not be occupied for sleeping purposes.
Both the zoning officer and the fire official interpreted the phrase "interior public areas" in PM-405.7, as including living rooms. The judge noted but did not address plaintiffs' argument that defendants "misinterpreted the BOCA Code by determining the `maximum occupancy' strictly by measuring bedrooms." The judge determined only that Ordinance section 26-7.4(a) was consistent with the BOCA Code.
Plaintiffs contend that defendants' calculation of occupancy by using solely bedroom space "gives short shrift to the rest of the dwelling and unjustifiably limits the number of occupants at the unit." Plaintiffs argue that the reference in PM-405.3 to rooms "occupied for sleeping purposes," rather than bedrooms, implies that nonbedrooms could be used for sleeping purposes. They point out that the BOCA Code defines "habitable space" as "[s]pace in a structure for living, sleeping, eating or cooking," PM-402.1, and they conclude *959 that living rooms may be used for sleeping provided they meet the square footage requirements of PM-405.3.
We reject plaintiffs' interpretation that all "habitable space" except kitchens could be used for sleeping. Such an expansive view would render the prohibition against using interior public areas for sleeping, set forth in PM-405.7, meaningless. While plaintiffs contest defendants' interpretation, they fail to offer any other reasonable meaning of "interior public areas," or to cite any authority for their interpretation of PM-405. We cannot accept plaintiffs' crabbed view of "occupied for sleeping purposes" other than the wellunderstood common parlance of "bedrooms." We conclude, as did the trial judge, that defendants' interpretation that "interior public areas" includes living rooms is reasonable and consistent with a logical reading of the ordinance.
Plaintiffs further claim that defendants apply PM-405 to determine occupancy for summer rentals, but not for year-round housing, in violation of plaintiffs' right to equal protection. According to plaintiffs, it is not disputed that the "Ordinance is aimed at curbing the summer rental market." Plaintiffs cite the legislative findings sections of the Ordinance, 26-7.1, -11.1, which specifically address summer rentals. Plaintiffs suggests that PM-405 should apply to all properties. They note that PM-401.1, "Scope," provides that chapter four "shall govern the minimum conditions and standards for ... space for the occupancy of a structure"; there is no limitation to structures that are rented seasonally.
The Ordinance, however, does require the application of PM-405 to all buildings. It imposes a penalty for any violation of the BOCA Code, Ordinance ง 26-2.8a, and establishes a fine for occupancy violations under PM-405, without any limitation to summer rentals, Ordinance ง 26-2.8b. Despite its legislative findings targeting summer rentals, the occupancy provision of the Ordinance on its face is universal and does not discriminate against summer rentals. In fact, the zoning officer observed that he applied the BOCA Code to all properties, not just summer rentals. He said: "I cover the whole Property Maintenance Code with respect to all the properties in Belmar" including all rentals, summer, winter and year-round. On the other hand, Pringle conceded that occupancy standards were not imposed on full-time properties, explaining that "we have our biggest problems" with summer rentals. Despite this apparent factual variance, even if defendants applied the BOCA Code occupancy standards only or primarily to summer rentals, we find no violation of plaintiffs' equal protection rights, and our consideration of both the Federal and State Constitutions supports this conclusion.
The Fourteenth Amendment provides: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, ง 1. An economic regulation such as the Ordinance, which "does not affect a suspect or semi-suspect class and does not attempt to regulate a fundamental right,... need [only be] rationally related to a legitimate state interest to satisfy federal equal protection requirements." Brown v. City of Newark, 113 N.J. 565, 573, 552 A.2d 125 (1989). An economic regulation must not be "arbitrary, capricious, or unreasonable." Id. at 572, 552 A.2d 125. Plaintiffs concede that the rational basis standard applies.
The New Jersey Constitution does not use the term "equal protection," but states: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of *960 acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." N.J. Const. art. I, ถ 1.
"The analysis of fundamental rights under the New Jersey Constitution differs from analysis of those rights under the United States Constitution." Greenberg v. Kimmelman, 99 N.J. 552, 567, 494 A.2d 294 (1985). Our analysis of this issue requires application of a balancing test, considering "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Ibid. "In striking the balance .... the more personal the right, the greater the public need must be to justify governmental interference with the exercise of that right." George Harms Constr. Co. v. New Jersey Tpk. Auth., 137 N.J. 8, 29, 644 A.2d 76 (1994). In addition, the factors to be balanced are "implicit, if not explicit, in federal analysis of the due process and equal protection clauses." Greenberg, supra, 99 N.J. at 567, 494 A.2d 294.
An ordinance is entitled to a presumption of validity. Dome Realty, Inc. v. City of Paterson, 83 N.J. 212, 235, 416 A.2d 334 (1980). In Dome Realty, the Court held that the exemption of owneroccupied, two-family homes from the requirements of an ordinance establishing standards of habitability did not violate federal equal protection. Id. at 243, 416 A.2d 334. The Court found a rational basis in the exemption because "[l]andlords who live in their buildings have greater incentive to maintain them." Ibid. The city thus acted both rationally and efficiently in conserving "its enforcement resources for larger buildings with absentee landlords." Ibid.
We conclude that directing enforcement of occupancy standards toward summer rentals, if that occurred, is rationally related to the legitimate governmental interest of abating the overcrowding and resulting unacceptable conduct and conditions that occur in summer rentals. Contrary to plaintiffs' arguments, the judge's finding, and the underpinning of his equal protection analysis that these problems emanated from summer rentals, was supported by ample credible evidence. Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495. The judge quoted the legislative findings of the Ordinance, cited the supporting testimony of the Mayor and Council members, and concluded that their testimony "was believable and generally supported the Borough's reasoning behind the Ordinance. The inescapable conclusion based on the testimony is that some summer renters create a significant problem for the law-abiding citizens of Belmar."
There was considerable persuasive evidence to support the finding that overcrowding, unsafe conditions, noise and unruly behavior in Belmar emanated from summer rentals. Although anecdotal, Pringle personally heard noise and observed rowdy behavior at summer rentals, and reported complaints about summer tenants using obscene language and urinating in public. Council members corroborated reports of drinking, noise, and bad behavior among summer renters. Borough officials reported overcrowding in summer rentals and the resulting unsafe conditions, both from personal observations and from complaints.
Plaintiffs point to the absence of empirical data to support the conclusion that summer rentals caused Belmar's problems. However, formal studies conducted by experts are not required. "Legislative bodies are presumed to act on the basis of adequate factual support and, absent a sufficient showing to the contrary, it will be assumed that their enactments rest upon some rational basis within their knowledge and experience." Hutton Park *961 Gardens v. Town Council of West Orange, 68 N.J. 543, 564-65, 350 A.2d 1 (1975) (upholding a rent control ordinance) (quoted in Dome Realty, supra, 83 N.J. at 235, 416 A.2d 334). More recently, we explained: "A municipality's legislative exercise is not to be set aside if any basis may reasonably be conceived to justify the ordinance." Mannie's Cigarette Serv., Inc. v. Town of West New York, 259 N.J.Super. 343, 347-48, 613 A.2d 494 (App.Div.1992).
Witnesses who observed overcrowding and unacceptable behavior at summer rentals, and who, in their capacity as municipal officials, received complaints from residents, provided an adequate basis for the judge's factual finding. Their observations constituted a rational basis, within defendants' knowledge and experience, to justify the Ordinance. Editorial comments noted by plaintiffs regarding a distaste for summer rentals are irrelevant to our analysis and will not invalidate an otherwise valid ordinance. Conversely, demonizing the proponents of the legislative action as "evil" is not persuasive in a facial attack on the Ordinance.
Finally, we reject plaintiffs' contention that a small number of occupancy violation summonses issued in the summers of 1997 and 1998 proved that overcrowding did not exist. Pringle explained that
the problem with chronic overcrowding in Belmar, isn't how many summonses we give out. The problem is you don't get to give summonses out.... I'm not looking to give out more summonses for overcrowding.
But the number of summonses that we're giving out is a small percentage of the number of problems we have.
As the trial judge aptly noted, the Court in Kirsch Holding Co. v. Borough of Manasquan, 59 N.J. 241, 281 A.2d 513 (1971), in invalidating zoning ordinances in the Boroughs of Belmar and Manasquan which prohibited group rentals, acknowledged the same problems in Belmar that the Ordinance here addresses:
The evil which the ordinance provisions in question seek to prevent relates to the uninhibited social conduct of many such group rental occupants within and without the buildings. Unquestionably, and regrettably, excessive noise at all hours, wild parties, intoxication, acts of immorality, lewd and lascivious conduct and traffic and parking congestion often accompany these group rentals.... In essence, they constitute a public and private nuisance by not meeting the minimal standards of expected social conduct even in this rather permissive day and age.
[Id. at 245, 281 A.2d 513.]
To address overcrowding and its resulting problems, the Court suggested "housing code provisions, which would have to be of general application, limiting the number of occupants in reasonable relation to available sleeping and bathroom facilities or requiring a minimum amount of habitable floor area per occupant." Id. at 254, 281 A.2d 513.
Our Supreme Court has subsequently approved municipalities' addressing overcrowding in this way, rather than by indirect means. Borough of Glassboro v. Vallorosi, 117 N.J. 421, 428, 432-33, 568 A.2d 888 (1990) (noting that college students sharing a home qualified as a family unit under municipal ordinance); State v. Baker, 81 N.J. 99, 110, 114, 405 A.2d 368 (1979) (observing that municipality may not condition residence on the number of unrelated persons living together).
In Sente v. Mayor of City of Clifton, 123 N.J.Super. 274, 302 A.2d 536 (App.Div. 1973), vacated as moot, 66 N.J. 204, 209, 330 A.2d 321 (1974), we upheld an ordinance *962 establishing minimum floor space requirements for housing, commenting:
[H]ousing space limitations present fundamental policy decisions for determination by municipal governing units. Health regulations are of the utmost consequence to the general welfare, and if they are reasonable, impartial and not against the general policy of the State, they must be submitted to by individuals for the good of the public, irrespective of pecuniary loss. The record, as well as common sense, affirms the existence of a correlation between minimum dwelling space requirements and health.
[Id. at 279, 302 A.2d 536 (citation omitted).]
This is what defendants have done here. The Ordinance limits the number of occupants in relation to the available sleeping facilities and the amount of floor space, in accordance with the BOCA Code.
Defendants demonstrated that overcrowding and its accompanying problems occur predominantly in summer rentals. Directing enforcement of the Ordinance's occupancy restrictions toward summer rentals is rationally related to the legitimate public interest of abating these problems sufficient to withstand a federal constitutional challenge.
Applying the balancing test analyses under Article I, Paragraph 1 of the New Jersey Constitution, the affected right is that of property owners to maximize their profits by renting to more tenants for the summer. The Ordinance intrudes upon this right by impacting upon the owners' profits. The counterbalance is the strong public need to alleviate summer overcrowding and its resulting conditions, which are unsafe to inhabitants and "detrimental to the health, safety, welfare and quality of life of other nearby residents and visitors." Ordinance section 26-7.1E. Plaintiffs' asserted right is economic, not personal; however, the public need is substantial. We find no constitutional basis for setting aside the occupancy limitation provisions of the Ordinance.

III.
Plaintiffs next assert that the judge erred in failing to void portions of the Ordinance's fire restrictions, which are more stringent for summer rentals than for other properties; they argue that these provisions violate equal protection principles and contradict the Uniform Fire Code, N.J.A.C. 5:70 (UFC). Defendants counter that the fire safety regulations of the Ordinance are reasonably related to the protection of summer residences and the entire community, and are not preempted by state regulation.
The provision in issue, Ordinance section 26-7.6, "Fire Prevention Regulations Applicable to Summer Rental Licensed Premises": (a) prohibits locks on bedroom doors designed to be locked from outside the room; (b) requires smoke detectors to be in working order at all times; and (c) prohibits "beds, mattresses, futons or sleeping bags" in any location other than a bedroom, and prohibits the use of "curtains, sheets, cardboard or any other material of any kind" as "temporary partitions between beds or sleeping areas." Ordinance ง 26-7.6a-c.
Subsection d sets forth several requirements for summer rentals with a permitted occupancy of eight or more persons, including: (1) an approved smoke detection system; (2) a fire escape, in addition to another means of egress, for structures with bedrooms on a third floor or higher; (3) self-closing doors that open into passageways "at grade or exit stair"; and (4) corridor doors that are at least one and three-eighths inches solid-core wood or an *963 approved equivalent. Ordinance ง 26-7.6d.
The judge determined that the UFC did not preempt more restrictive requirements. Applying the rational basis test for equal protection, because the provisions in question did not target any fundamental right or suspect class, the judge held that they were "presumably valid." However, the judge ruled that subsection c was "too broad." He reasoned that sleeping should be allowed in an area that was not a bedroom, so long as the area was habitable and satisfied the other BOCA requirements. Plaintiffs do not contest this aspect of the judge's ruling, but defendants object to the invalidation of the second sentence of subsection c, prohibiting the use of flammable materials as partitions, which the judge did not address.[2]
One of the provisions which plaintiffs contend that the judge ignored is the Uniform Fire Safety Act, N.J.S.A. 52:27D-213a (UFSA). It provides: "This act shall not be construed as authorizing the adoption of ... an ordinance requiring that a building conforming in all respects to the requirements of the `State Uniform Construction Code Act' [N.J.S.A. 52:27D-119 to -140] be made to conform to more restrictive requirements." Plaintiffs complain that Ordinance section 26-7.6d violates this provision by requiring new smoke detection systems, when the old systems met the requirements of the Uniform Construction Code and UFC applicable when they were installed.
The Ordinance requires smoke detectors to comply with NFPA (National Fire Protection Association Code) section 70-93. Ordinance ง 26-7.6d.1. The Uniform Construction Code, N.J.A.C. 5:23-1.1 to 5.23-12A.6, adopts Chapter 9, "Fire Protection Systems," of the BOCA National Building Code (13th ed.1996), as part of its fire protection subcode. The BOCA National Building Code section 920.1 requires smoke detectors to be installed in accordance with NFPA section 72. The UFC, N.J.A.C. 5:70-4.19(c), provides that smoke detectors "shall be listed in accordance with ANSI/UL 217, incorporated herein by reference."
Plaintiffs failed to demonstrate that the requirement set forth in the Ordinance is more restrictive than the requirement set forth in either the BOCA National Building Code or the UFC. Nor have they shown that any smoke detector in any summer rental conformed to any regulation in effect when it was installed. Moreover, contrary to plaintiffs' argument, the judge correctly observed that an ordinance may impose more stringent fire safety standards than the UFC. The UFSA provides: "Nothing in this act shall preclude the right of any municipality to adopt an ordinance dealing with fire safety whether or not it is more restrictive than this act and the regulations promulgated thereunder." N.J.S.A. 52:27D-202b.
The UFC allows local governments to regulate the repair, use and maintenance of buildings. N.J.A.C. 5:70-1.4(c). This section provides:
When any provision of this Code is found to be in conflict with any zoning, safety, health or other applicable ... ordinance ... of the jurisdiction existing on the effective date of this Code or hereafter adopted, the provision which establishes the higher standard for the *964 promotion and protection of the safety and welfare of the public shall prevail.

[Id.]
Plaintiff's claim that the fire-safety standard contained in the Ordinance is invalid because it is more stringent than a standard set forth in the UFC is not only erroneous, it conflicts with the plain language of the administrative code.
The fire protections set forth in Ordinance section 26-7.6 do not violate equal protection because they are rationally related to the legitimate government interest of containing the fire hazard caused by summer overcrowding. See Brown, supra, 113 N.J. at 573, 552 A.2d 125. Plaintiffs complain about the expense resulting from these more stringent fire regulations, but the financial impingement on them pales in comparison to the need for public fire safety. See Greenberg, supra, 99 N.J. at 567, 494 A.2d 294.
Plaintiffs focus on other seemingly unrelated conduct by defendants to support their fire protection claim. Arguing that such action constitutes discrimination, plaintiffs contend that "Belmar prepared a flier to send out to former renters to weed out `undesirables.' " The flier stated: "Welcome to Belmar ... WARNING! SUMMER RENTAL OCCUPANCY LIMITS STRICTLY ENFORCED." It admonished renters to learn the occupancy limit of their units, advised that it was unlawful to exceed the limit between 1:30 a.m. and 8:30 a.m., and warned that fines would be imposed for violations.
Plaintiffs apparently view this alleged discrimination against summer rentals as another violation of equal protection, supporting their theory that the imposition of stricter fire regulations was discriminatory.
While alluding to instances of decreased interest in summer rentals by those reading the flier, plaintiffs failed to provide any evidential basis for an inference that the purpose of the flier was to discourage "undesirables." Making prospective tenants aware of new regulations is not unconstitutional; moreover, there is no constitutional prohibition against controlling dangerous conditions, such as overcrowding, and unruly behavior, such as drinking, cursing and urinating in public. "Undesirables" who create these conditions and indulge in this behavior are not a protected class. The imposition of more stringent fire restrictions on summer rentals did not violate either equal protection principles or the UFC.

IV.
We likewise easily dispose of plaintiffs' next contention that the judge erred in rejecting their claim of selective enforcement of the Ordinance, again allegedly in violation of plaintiffs' right to equal protection. They essentially claim that summer landlords were subject to arbitrary enforcement inconsistent with the enforcement of such ordinances as applied to year-round properties.
Two elements must be established to succeed on a claim of unconstitutional enforcement of an ordinanceโ"a discriminatory effect and a motivating discriminatory purpose." Township of Pennsauken v. Schad, 160 N.J. 156, 183, 733 A.2d 1159 (1999); State v. Di Frisco, 118 N.J. 253, 266, 571 A.2d 914 (1990). As the Court observed in Schad:
In order to establish unconstitutional enforcement of the ordinance, defendant must show both a discriminatory effect and a motivating discriminatory purpose. [Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547, 556 (1985).] The conscious exercise of some selectivity in enforcement is not a constitutional violation unless *965 the decision to prosecute is based upon an unjustifiable standard such as race, religion, or other arbitrary classification.
[Schad, supra, 160 N.J. at 183, 733 A.2d 1159 (citation omitted).]
The judge found that "Belmar's officials" were not "evil men and women bent on eliminating summer rentals through any means.... They were decent people trying to deal with a problem that has historically plagued Belmar."
The judge agreed with plaintiffs that
violations of ordinances by non-summer rental properties ... have not been as vigorously enforced. However, the building department in Belmar is certainly not over staffed and their priority has been directed toward the problems created from May to September. Perhaps, the Belmar officials could have acted more even-handed in dealing with other municipal problems, but the plaintiffs have not demonstrated that Belmar used an "unjustifiable standard" in enforcing various Ordinance provisions against summer renters.
The basis for the inconsistent enforcementโsummer rentals as opposed to yearround residentsโwas justified. As the judge found, summer rentals caused overcrowding and resulting hazards. Directing enforcement of the Ordinance "toward the problems created from May to September" was not an arbitrary or unjustifiable standard; it was reasonably related to the legitimate government objective of abating the unsafe and undesirable conditions caused by overcrowding.
We find no merit in plaintiffs' claims that Belmar's officials demonstrated favoritism or arbitrariness. The anecdotal references to enforcement regarding certain properties falls far short of establishing a pattern of discrimination. The plaintiffs failed to meet their burden to establish selective enforcement.

V.
We also reject plaintiffs' claim that the Ordinance is unconstitutional on substantive due process grounds. Plaintiffs contend that the judge erred in refusing to invalidate Ordinance section 26-2.8, which imposes liability for occupancy violations on all tenants.
Ordinance section 26-2.8b provides:
All tenants of a dwelling unit at the time the occupancy thereof unlawfully exceeds the maximum permitted occupancy thereof as calculated by the Code Official pursuant to Section PM-405.0 Occupancy Limitations shall be issued a summons which carries a minimum fine of two hundred and sixty-five ($265.00) dollars, plus court costs, payable through the Violations Bureau of the Municipal Court.
The judge, relying on State v. Kiejdan, 181 N.J.Super. 254, 437 A.2d 324 (App.Div.1981), determined that Ordinance section 26-2.8 was constitutional because "strict liability is a permissible tool for a municipal ordinance that is attempting to deal with a serious health and safety problem." He explained that the strict liability provision "was appropriate due to the well documented problems associated with overcrowding."
In Kiejdan, a landlord was convicted of failing to provide heat to tenants despite his claim that the heating system had been repeatedly vandalized. We held that strict liability was "an unexceptionable and appropriate legislative option where employed to implement a regulatory scheme designed to deal with a serious social problem." Id. at 258, 437 A.2d 324. We considered the landlord's obligation to furnish heat as "a regulatory scheme intended to protect and advance the public health and *966 safety," and the imposition of strict liability as "a necessary tool for the effectuation of its public purpose." Ibid. We rejected defendant's claim that strict liability violated his right to substantive due process, noting that he could have, but failed to take action to prevent a recurrence of vandalism. Id. at 260, 437 A.2d 324.
Plaintiffs distinguish Kiejdan, suggesting that "it was well established in [Kiejdan] that the failure to provide heat posed a threat to the health and safety of the tenants," whereas "[i]n the instant case no serious social problem exists." As did the trial judge, we disagree. The record clearly supported a finding of overcrowding and the problems attendant to such condition.
Generally, unless fundamental rights are involved, "a state statute does not violate substantive due process if the statute reasonably relates to a legitimate legislative purpose and is not arbitrary or discriminatory." Greenberg, supra, 99 N.J. at 563, 494 A.2d 294. Interpreting substantive due process rights under the Fourteenth Amendment, our Supreme Court set forth a more stringent standard: "substantive due process is reserved for the most egregious governmental abuses against liberty or property rights." Rivkin v. Dover Township Rent Leveling Bd., 143 N.J. 352, 366, 368, 671 A.2d 567, cert. denied, 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996) (noting that bias of member of rent leveling board did not result in violation of substantive due process).
We do not perceive that holding tenants liable for occupancy violations is an egregious abuse against liberty or property rights. Imposing liability on all tenants for occupancy violations is not arbitrary or discriminatory and advances the legitimate purpose of alleviating overcrowding and its resulting problems. The realities of the tenancies must be recognized. The complaints fostering the promulgation of the challenged Ordinance are premised on summer congregants sharing the common benefits of the rental; imposing liability for the misdeeds of fellow tenants is an acceptable burden to be assumed by all.
Contrary to plaintiffs' assertion that Ordinance section 26-2.8 interferes with their "fundamental right of privacy," the Ordinance carefully protects the privacy of occupants and owners. Critical procedural safeguards are in place. The Ordinance requires the code official to attempt to locate the owner or person in control of the building to request entry. Ordinance ง 26-2.1a. If the request is denied, the code official must obtain a search warrant. Ordinance ง 26-2.1a, c. No municipal official may enter a dwelling to determine whether an occupancy violation has occurred without first obtaining the permission of the occupant. Ordinance ง 26-2.1d.
In State v. Maldonado, 137 N.J. 536, 645 A.2d 1165 (1994), upholding the imposition of strict criminal liability on manufacturers and distributors of controlled dangerous substances when death results from their ingestion, the Court commented:
Absolute liability for regulatory offenses traditionally finds justification in administrative convenience, the need to deter through the most effective forms of prosecution, dispensing with proof of intent, and imposing relatively minor punishment, all adding up to a conclusion that whatever injustice results from strict liability is more than counterbalanced by benefit to the public.
[Id. at 550, 645 A.2d 1165.]
Here, the need to deter overcrowding is substantial, and the punishment, a fine of at least $265 plus costs, is relatively minor. The benefit to the public in abating the hazardous and undesirable results of overcrowding outweighs any injustice *967 resulting from strict liability. The judge was correct in determining that strict liability imposed on all tenants for violation of occupancy restrictions did not violate plaintiffs' (or tenants') right to substantive due process.

VI.
In their broad challenge to the Ordinance, plaintiffs assert that the Ordinance so severely restricted their use of and ability to rent their properties that its enforcement constituted a taking of private property for public use, in violation of the Fifth Amendment to the United States Constitution and the Article I, Paragraph 20 of the New Jersey Constitution.
Both the United States and New Jersey Constitutions prohibit the taking of private property "for public use, without just compensation." U.S. Const. amend. V; N.J. Const. art. I, ถ20. The principles of the federal and state constitutional doctrines "are in general conformity." Gardner v. New Jersey Pinelands Comm'n, 125 N.J. 193, 205, 593 A.2d 251 (1991). In Gardner, the Court upheld a portion of the Pineland Commission's Comprehensive Management Plan which restricted residential development to forty-acre lots, thirty-nine of which had to be permanently dedicated to agricultural use. Id. at 204-10, 593 A.2d 251. The Court explained that
takings analysis makes two fundamental demands of any zoning scheme: it must substantially advance legitimate state interests, and it cannot deny an owner all economically viable use of the land.... The economic effect of the regulatory scheme can be assessed in terms of the adjustment of economic benefits and burdens or the extent of interference with "distinct investment-backed expectations."
[Id. at 205, 593 A.2d 251 (citation omitted) (quoting Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124-28, 98 S.Ct. 2646, 2659-61, 57 L.Ed.2d 631, 648-51 (1978)).]
In determining whether there has been a taking, a court must consider whether a landowner retains viable and economicallybeneficial uses of the property and whether the challenged regulations advance legitimate and important public objectives. Id. at 205, 593 A.2d 251. See also Edgewater Inv. Assocs. v. Borough of Edgewater, 201 N.J.Super. 267, 271-72, 493 A.2d 11 (App.Div.1985), aff'd, 103 N.J. 227, 510 A.2d 1178 (1986) (holding that the protections afforded to tenants upon conversion from apartments to condominiums under the Senior Citizens and Disabled Protected Tenancy Act were not an unconstitutional taking since they advanced compelling public policies and represented a valid exercise of police power).
Plaintiffs claims here are multifaceted. They first assert that the application and inspection requirements of the Ordinance prevent them from renting their properties for an entire year. The Ordinance prohibits the code official from inspecting "any dwelling unit for purposes of issuing a Summer Rental License during a period it is occupied by another tenant, regardless of whether the tenant is present at the time of the inspection." Ordinance ง 26-3.9c. There is an exception for units occupied by families with school-aged children in the winter (summer rentals at these units may not begin until three days after the last school day). Ordinance งง 26-3.9c, -7.3.
This restriction does not prevent plaintiffs from renting their properties for the entire year. It has no impact on yearround rentals. If a landlord chooses seasonal rentals, this provision imposes only a short period of unrented time between the *968 summer and winter leases. Inspections must occur within five business days if the summer rental license application is filed before May 1, or within ten business days if the application is filed after May 1. Ordinance ง 26-3.9a.
In Dome Realty, supra, 83 N.J. 212, 416 A.2d 334, the Court rejected the argument that requiring that a unit be vacant when it was inspected was arbitrary and unreasonable, and that it prevented landlords from earning fair profits. Id. at 235-37, 416 A.2d 334. The Court accepted the testimony of housing inspectors that inspections of vacant dwellings were more effective and noted that this scheme encouraged landlords to make apartments available for inspection and to remedy defects. In addition, if violations were uncovered, there would be no need to evict tenants. These considerations also apply to housing in Belmar.
We reject plaintiffs' generalized claims that the Ordinance reduces the privacy of short term tenancies; that it limits plaintiffs' abilities to expand their properties; or that the fire or occupancy restrictions so impair the profitability of the rental units as to amount to a taking. These claims are not supported by the record; in fact, the record suggests that the summer rental market has not abated. Little credible evidence was presented that suggested a reduction in profits. Proofs suggesting "rent concessions," standing alone, fail to satisfy plaintiffs' burden to establish a taking. Gardner, supra, 125 N.J. at 210, 593 A.2d 251. Although plaintiffs' "investment-backed expectations" are a relevant consideration in determining economic impact, Penn Cent., supra, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648; Gardner, supra, 125 N.J. at 205, 593 A.2d 251, such proofs, woefully deficient here, must be considered in the context of whether a property owner is deprived of all or substantially all of the beneficial use of the totality of his property. See Karam v. New Jersey Dep't of Envtl. Prot., 308 N.J.Super. 225, 234-35, 705 A.2d 1221 (App.Div.1998), aff'd o.b., 157 N.J. 187, 723 A.2d 943, cert. denied, 528 U.S. 814, 120 S.Ct. 51, 145 L.Ed.2d 45 (1999) (holding that the denial of a permit to build a dock on riverfront property, because it would interfere with a shellfish habitat, did not constitute a taking. Destruction of the owner's investment-backed expectations is a factor to be considered, together with whether the regulation deprived the owner of "virtually all economically viable uses of the property" and whether the interest that was taken was vested with the owner).
Certain facts are inviolate. Plaintiffs retain a viable economic use of their property. The Legislature has acted to regulate summer shore rentals, authorizing municipalities to license and supervise them, N.J.S.A. 40:52-1(n), and to hold landlords responsible for tenants' disorderly behavior, N.J.S.A. 40:48-2.12n-r. The Ordinance promotes public health and safety by abating overcrowding and fire hazards. Plaintiffs have failed to establish that the Ordinance deprived them of all economically viable use of their property. There was no taking.

VII.
We now focus our attention on plaintiffs' claim that the judge incorrectly upheld Ordinance section 26-7.4, prohibiting the presence of more than the permitted number of occupants in a summer rental at certain hours, on the ground that it did not constitute a curfew. Plaintiffs assert that the Ordinance restrictions are "an infringement on one's right to privacy, due process and equal protection," as well as overbroad. Defendants contend that the Ordinance does not constitute a curfew because it does not compel people to remove *969 themselves from the streets at an appointed time. We agree that the Ordinance does not create a curfew but disagree with the judge's conclusion as to the effect of the Ordinance on occupancy. We reverse this determination and invalidate this provision.
Ordinance section 26-7.4b provides: "It shall be unlawful at any time between the hours of 1:30 a.m. and 8:30 a.m. for the number of adults in a Summer Rental Licensed dwelling unit to exceed the maximum permitted occupancy as calculated by the Code Official." We agree with both the judge and defendants that Ordinance section 26-7.4b does not constitute a curfew because it does not prohibit anyone from appearing in public or on "the streets" after a specified hour. See Black's Law Dictionary 344 (5th ed.1979).
We disagree, however, with the judge's conclusion that the Ordinance improperly enforces occupancy limits. Ordinance section 26-7.4b does not pertain to occupancy per se. It prohibits the presence of adult occupants and non-occupants alike in a summer rental when the number of people exceeds the permitted occupancy. This does not serve to keep or insure the occupancy level at the permitted number.
The Ordinance contains no definition of occupancy or occupant, but the common meaning of occupant is a person who resides in a dwelling. The number of residents or occupants remains the same regardless of how many people are present in the dwelling at any particular time. The effect of this Ordinance provision is to either exclude guests when all occupants are present or exclude occupants so that guests may be present, during the specified hours. We conclude that Ordinance section 26-7.4b interferes with summer residents' right to have visitors in their homes, a component of their right to privacy, and that it is overbroad in accomplishing a legitimate municipal goal, in violation of summer residents' due process rights.
We first observe that the right to have guests or visitorsโnon-occupantsโpresent in one's home is not, in and of itself, a constitutional or fundamental right. However, as the United States Supreme Court has acknowledged, the right to privacy in one's home encompasses the right to host guests. In an unrelated context, the United States Supreme Court explored the relationship of social guests and privacy rights. In Minnesota v. Olson, 495 U.S. 91, 95-100, 110 S.Ct. 1684, 1687-90, 109 L.Ed.2d 85, 92-96 (1990), the Court held that an overnight guest had a reasonable expectation of privacy, so that a warrantless entry into the house to arrest him violated his Fourth Amendment right to freedom from an unreasonable search and seizure. The Court commented that its holding "merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." 495 U.S. at 98, 110 S.Ct. at 1689, 109 L.Ed.2d at 94.
More recently, Justice Ginsburg, in dissent, emphasized that the home was "the most essential bastion of privacy recognized by the law." Minnesota v. Carter, 525 U.S. 83, 106, 119 S.Ct. 469, 481, 142 L.Ed.2d 373, 390 (1998) (Ginsburg, J., dissenting). She commented:
My concern centers on an individual's choice to share her home and her associations there with persons she selects. Our decisions indicate that people have a reasonable expectation of privacy in their homes in part because they have the prerogative to exclude others. The power to exclude implies the power to include. See, e.g., ... Alschiler, Interpersonal Privacy and the Fourth Amendment, 4 N. Ill. U.L.Rev. 1, 13 *970 (1983) ("[O]ne of the main rights attaching to property is the right to share its shelter, its comfort and its privacy with others.").
[525 U.S. at 107, 119 S.Ct. at 482, 142 L.Ed.2d at 391 (other citations omitted).]
Here, plaintiffs and their summer tenants have no complaint about any physical intrusion into, or search of their homes. Nevertheless, their right to privacy in their homes includes the choice to share it with others.
The right to privacy in New Jersey is expansive. It derives not only from the Search and Seizure Clause of the New Jersey Constitution, N.J. Const. art. I, ถ7, and New Jersey common law, but also from the "natural and unalienable rights" which all people have under Article I, Paragraph 1 of the New Jersey Constitution. N.J. Const. art. I, ถ 1, supra, p. 17, 777 A.2d pp. 959-60. Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 94-99, 609 A.2d 11 (1992) (declining to decide whether a private employer's random urine testing of an employee for drugs violated the employee's right to privacy, but holding that "constitutional privacy protections may form the basis for a clear mandate of public policy supporting a wrongful-discharge claim"). A summer tenants' right to share their homes with guests or visitors, even when all occupants are present, is within the panoply of their right of privacy.
There are other legitimate complaints pertaining to the effect of this section of the Ordinance. We conclude that the Ordinance provision in issue here is overbroad. "[T]he overbreadth doctrine `involves substantive due process considerations concerning excessive governmental intrusion into protected areas.' " Karins v. City of Atlantic City, 152 N.J. 532, 544, 706 A.2d 706 (1998) (quoting In re Soto, 236 N.J.Super. 303, 324, 565 A.2d 1088 (App.Div.1989), certif. denied, 121 N.J. 608, 583 A.2d 310 (1990), cert. denied, 496 U.S. 937, 110 S.Ct. 3216, 110 L.Ed.2d 664 (1990)). The Legislation must reach "a substantial amount of constitutionally protected conduct," and "there must be a strong showing that the statute's deterrent effect on legitimate expression is real and substantial." In re Soto, supra, 236 N.J.Super. at 324, 565 A.2d 1088. The overbreath concept "rests on principles of substantive due process" and "whether the reach of the law extends too far. The evil of an overbroad law is that in proscribing constitutionally protected activity, it may reach farther than is permitted or necessary to fulfill the state's interests." Town Tobacconist v. Kimmelman, 94 N.J. 85, 125 n. 21, 462 A.2d 573 (1983).
Substantive due process requires that the legislation under attack have a legitimate purpose or a "conceivable rational basis." Greenberg, supra, 99 N.J. at 563, 494 A.2d 294. However, when a fundamental right is involved, due process requires a "more exacting" standard. Id. at 564, 494 A.2d 294.
The Court set forth this standard in cases in which the statute in question "encroach[es] on First Amendment interests"; whether it is overbroad
turns upon whether there is a compelling state interest to be served by the statute and a substantial connection between that compelling governmental interest and the statutory regulation; the compelling state interest must clearly outweigh the "repressive effect" on expressional or associational rights engendered by the application of the statute.
[New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, 82 N.J. 57, 70, 411 A.2d 168 (1980).]
*971 Defendants have articulated no legislative purpose for Ordinance section 26-7.4b, other than to assertedly address the general overcrowding, and resulting safety hazards and nuisances, that occur in summer rentals, as set forth in Ordinance section 26-7.1, "Legislative Findings." Prohibiting the number of people allowed in a dwelling between 1:30 a.m. and 8:30 a.m. to exceed the occupancy rate abates overcrowding due to guests, but it does not abate the continuous or long-term overcrowded living conditions resulting from too many occupants. We acknowledge that limiting the number of people allowed in a dwelling during the specified hours may alleviate the problems of "excessive noise, unruly behavior, obscene language, fighting, littering, parking of vehicles on lawns, public urination, poor maintenance of the property and grounds, and violation of trash collection ordinances," at least during the hours defendants chose for its application. It thus has a "conceivable rational basis." See Greenberg, supra, 99 N.J. at 563, 494 A.2d 294. However, applying the "compelling state interest" test used when the legislation encroaches upon First Amendment or fundamental rights, Chamber of Commerce, supra, 82 N.J. at 70, 411 A.2d 168, the government interest served by Ordinance section 26-7.4b, reducing the undesirable behavior described in Ordinance section 26-7.1, and overcrowding due to guests, does not outweigh its repressive effect on privacy and associational rights.
There are instances where the asserted public safety interests claimed by defendants are potentially at cross-purposes. It is a short inductive leap to envisage summer rental occupants or their guests consuming alcoholic beverages. In these circumstances, we can further perceive the restriction potentially encouraging people who are intoxicated to drive because they are not allowed to remain in the dwelling unit after 1:30 a.m. if the number of people present exceeds the occupancy limit. Public safety would be well-served by permitting intoxicated guests or occupants to remain at the summer rental unit until they are able to depart safely, instead of forcing them to leave. This public safety problem of driving while intoxicated renders the necessity for Ordinance section 26-7.4b less compelling in a balancing test.
Additional probable circumstances are equally of concern. Other ordinances or statutes prohibiting disorderly or criminal conduct apply to the objectionable behavior which Ordinance sections 26-7.1 and -7.4b seek to prevent. See, e.g., N.J.S.A. 2C:33-2a(1) (engaging in "fighting or threatening, or in violent or tumultuous behavior" is a petty disorderly persons offense); N.J.S.A. 2C:33-11 (defacing or damaging private property without the permission of the owner or tenant is a crime of the fourth degree); N.J.S.A. 2C:33-4 (harassment, which includes communicating "in offensively coarse language" and "striking, kicking, shoving, or other offensive conduct, or threatening to do so," is a petty disorderly persons offense). In addition, Belmar Ordinance section 16-3 prohibits excessive noise. In instances when such objectionable conduct occurs, defendants may prosecute under these provisions. Ordinance section 7.4b is thus duplicative of these more specific provisions, another factor rendering its governmental purpose less compelling and contributing to the conclusion that it is overbroad. These various statutes and related ordinances present a less drastic means to accomplish legitimate municipal goals, including preventing breaches of the peace. Compare Allen v. City of Bordentown, 216 N.J.Super. 557, 562-78, 524 A.2d 478 (Law Div.1987) (voiding a curfew imposed on minors), with N.J.S.A. 40:48-2.52b, d (permitting municipalities to impose *972 curfews on juveniles between 10:00 p.m. and 6:00 a.m., with exceptions for medical emergencies and events sponsored by educational, religious, or community organizations).
Our Supreme Court has admonished municipalities that zoning ordinances are inappropriate means to "prevent one segment of the summer population from ... adversely affecting other vacationers and permanent residents." Kirsch, supra, 59 N.J. at 253, 281 A.2d 513. The Court said: "Ordinarily obnoxious personal behavior can best be dealt with officially by vigorous and persistent enforcement of general police power ordinances and criminal statutes.... Zoning ordinances are not intended and cannot be expected to cure or prevent most anti-social conduct in dwelling situations." Id. at 253-54, 281 A.2d 513. See also Vallorosi, supra, 117 N.J. at 433, 568 A.2d 888; Baker, supra, 81 N.J. at 111, 405 A.2d 368. Although Ordinance section 26-7.4b is not a zoning ordinance, the same principles apply. Its broad application, like that of zoning provisions, makes it inappropriate to control "obnoxious personal behavior."
We further conclude that Ordinance section 26-7.4b implicates protected conduct and extends too far in fulfilling Belmar's interest. Limiting the number of people allowed in a dwelling to the occupancy rate extends to potentially ban many groups whose presence does not result in overcrowding, production of excessive noise, unruly behavior, fighting, littering, parking of vehicles on the lawn, urinating in public, causing poor property maintenance, or violating trash ordinances.
The record fails to support the premise that many or most gatherings in numbers that exceed the occupancy rate during the proscribed hours engage in this objectionable conduct. To the contrary, the evidence suggests that most summer tenants do not cause these problems. Witnesses describe the problem as applying to "a handful of properties" and "maybe 20 percent" of summer tenants behaved badly. Such evidence is insufficient to serve as a factual predicate for the broad scope of this section. The Ordinance impacts upon a substantial amount of protected behavior, more than is necessary to abate the nuisances described in the Ordinance's legislative findings in section 26-7.1.
We conclude that although Ordinance section 26-7.4b does not constitute a curfew, it is an overbroad intrusion on summer tenants' privacy rights to share their homes with others, and violates their right to substantive due process. That provision of the Ordinance is invalid.

IX.
Before addressing defendants' cross-appeal, we easily dispose of plaintiffs' remaining claims.[3] We find no merit in plaintiffs' claim that the fee increase for summer rental licenses to $100 is unsubstantiated and punitive. We first observe that the summer rental licensing provisions of N.J.S.A. 40:52-1(n) authorize the licensing; moreover, N.J.S.A. 40:48-2.12m permits the municipality to charge a fee. We are satisfied that the presumption of reasonableness applies with substantial force here. See State v. Boston Juvenile Shoes, 60 N.J. 249, 258, 288 A.2d 7 (1972). We find nothing in the record to suggest that this fee is unreasonable.
We reach the same result with respect to the fifty-dollar tourism fee. The fee is authorized by N.J.S.A. 40:52-7, and nothing in the record suggests that it is excessive. We affirm the trial judge's findings in that regard.
*973 Finally, we dispose of plaintiffs' contention that the judge improperly severed portions of the Ordinance or provided a "guidebook" to defendants in his opinion as to how to amend the Ordinance.
The trial judge had the authority to engage in "judicial surgery," or narrow construction of a statute or ordinance, to free it from constitutional doubt or defect. See N.J.S.A. 1:10-1; Chamber of Commerce, supra, 82 N.J. at 75, 411 A.2d 168. The issue focuses on both legislative intent, ibid., and whether the objectionable feature of the ordinance can be excised without substantial impairment of the principal object of the statute. Affiliated Distillers Brands Corp. v. Sills, 60 N.J. 342, 345, 289 A.2d 257 (1972). We will enforce severability where the invalid portion is independent and the remaining portion forms a complete act within itself. Inganamort v. Borough of Fort Lee, 72 N.J. 412, 423, 371 A.2d 34 (1977). Such is the case here, as the remaining provisions present a viable legislative action, constitutionally sound, and capable of lawful enforcement.
So too, we reject plaintiffs' claim that an ordinance under attack may not be amended during the course of litigation. See Van Dalen v. Washington Township, 205 N.J.Super. 308, 333, 500 A.2d 776 (Law Div.1984) (noting that where an ordinance is amended during the course of litigation, a court will ordinarily decide the validity of the ordinance in its amended form). All of these contentions are clearly without merit and need no further discussion. R. 2:11-3(e)(1)(E).

X.
We now address defendants' claims of error. Defendants first mount a multifaceted challenge to the judge's invalidation of Ordinance section 26-7.3, under the Act and equal protection principles. Ordinance section 26-7.3 requires that rentals to families with children, for any time from September 15 to May 15, not be occupied for the summer until the third day after the last day of the school year. Defendants argue substantively that: a) plaintiffs did not have standing to raise a claim under the Act; b) the Act is unconstitutional under the Commerce Clause as applied to the Ordinance; and c) the Ordinance does not discriminate on the basis of family status. We also consider plaintiffs' challenge to the quantum of counsel fees awarded on its claim under the Act.
The factual predicate for section 26-7.3 was based in part on a descriptive summary of the plight of Belmar school children in that community. Dr. Lester Richens, Belmar's Superintendent of Schools for over twenty years, explained that children starting school late and leaving early was a long-term problem. Richens noted that Belmar's mobility rate always exceeded the state average of 16%, ranging from 22.5% to 38% between 1994 and 1999. According to Richens, keeping a child in the district for the full school term was "really beneficial for the educational program of that child." Richens said that "the majority of the students leaving after March is due to the winter rental situation," and many of the families who are displaced in the spring become homeless or move into motels. When families relocate into welfare motels, their living quarters are overcrowded, and the children are unable to complete homework assignments. In addition, some children whose families move out of the district in the spring finish the school year in Belmar, with their families providing transportation, but many of these children are left "to wander the streets after school" until their families pick them up at 5:00 p.m. or 6:00 p.m. Children's attention patterns become sporadic and their tardiness increases. According *974 to Richens, "we have a real problem when it comes to children needing stability, and if the Belmar community can give them one year of stability in their education, I think it's well worth it."
The Act provides, in relevant part, that "it shall be unlawful ... [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of ... familial status."[4] 42 U.S.C.A. ง 3604(b).
The Act further provides:
Nothing in this subchapter shall be construed to invalidate or limit any law of a State or political subdivision of a State ... that grants, guarantees, or protects the same rights as are granted by this subchapter; but any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid.

[42 U.S.C.A. ง 3615.]

A.
We briefly address the issue of standing. The judge determined that plaintiffs had standing under the Act, concluding that courts have interpreted standing to pursue a claim under the Act broadly and that the Act includes associations and legal representatives in its definition of "persons." 42 U.S.C.A. ง 3602(d).
The Act authorizes an "aggrieved person" to commence a civil action in state court. 42 U.S.C.A. ง 3613(a)(1)(A). An "aggrieved person" is defined as "any person whoโ(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C.A. ง 3602(i).
The judge relied on Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 1609 n. 9, 60 L.Ed.2d 66, 79 n. 9 (1979) ("as long as the plaintiff suffers actual injury as a result of the defendant's conduct, he is permitted to prove that the rights of another were infringed"), and concluded that plaintiffs were sufficiently aggrieved to pursue a claim under the Act.
We reject defendants' argument that plaintiffs do not have standing because they are not "members of the class of individuals protected by the Federal Fair Housing Act." Other courts have consistently allowed non-members of a protected class to bring actions under the Act, as long as the defendant's violation of the Act resulted in injury to the plaintiffs. For example, in San Pedro Hotel Co. v. City of Los Angeles, 159 F.3d 470, 472-75 (9th Cir.1998), plaintiff hotel owners who had contracted to sell their hotel to a nonprofit developer for use as housing for the mentally disabled had standing to sue under the Act, when the city declined to approve a federally-funded loan to finance the project, despite plaintiffs'"tenuous" connection to the protected individuals:
[T]o establish standing under the Act, all the [plaintiffs] need show is that the City interfered with the housing rights of the mentally ill and that, as a result, the [plaintiffs] suffered an actual injury.
As potential sellers of the property who were unable to sell their property to a buyer because of the City's allegedly improper interference with an HUD loan, the [plaintiffs] meet this test.

*975 [Id. at 475.]
See also, Baytree of Inverrary Realty Partners v. City of Lauderhill, 873 F.2d 1407, 1408 (11th Cir.1989) (holding that a real estate developer, not a member of the protected class under the Act, had standing under the Act to challenge a municipality's refusal to amend a zoning ordinance to allow low-income housing); Mackey v. Nationwide Ins. Cos., 724 F.2d 419, 420, 422-23 (4th Cir.1984) (holding that former agent of defendant-insurance company who alleged that defendant practiced "redlining," or an "arbitrary refusal to underwrite the risks of persons residing in predominantly black neighborhoods," had standing under the Act because he alleged "an economic injury to himself").
Plaintiffs suffer actual economic injury as a result of the Ordinance; when they rent to families with children over the winter, the term of their summer rentals becomes restricted. Like the owners who were unable to sell their property in San Pedro, supra, 159 F.3d at 475, and the builder who was unable to build low-income housing in Baytree, supra, 873 F.2d at 1408, plaintiffs are unable to lease their properties for the terms that are most profitable.
We agree with defendants' observation that plaintiffs' interests are adverse to the interests of the family-tenants whom the Ordinance seeks to protect. However, that diversity of interest, even contrary to the protected class, does not deprive plaintiffs of standing under the Act. Plaintiffs need show only actual injury to themselves as a result of defendants' conduct. Bellwood, supra, 441 U.S. at 103 n. 9, 99 S.Ct. at 1610 n. 9, 60 L.Ed.2d at 79 n. 9.
We reject defendants' reliance on Nasser v. City of Homewood, 671 F.2d 432 (11th Cir.1982). The denial of standing in Nasser was based on zoning which impacted on plaintiff's economic loss alone. Id. at 435-38. Here, in contrast, the Ordinance restricts plaintiffs' use of their properties only when they rent to families with children. The Ordinance thus imposes special conditions for rentals to a class protected by the Act. Unlike Nasser, here the disparate treatment set forth in the Ordinance causes plaintiffs' economic loss. It is this disparate treatment under the Ordinance which serves as the underpinning to support plaintiffs' claim of standing.

B.
Defendants attack the Act as unconstitutional, asserting that its enactment is beyond the authority of Congress under the Commerce Clause and the Fourteenth Amendment. The Commerce Clause provides: "The Congress shall have Power... [t]o regulate Commerce ... among the several States." U.S. Const. art. 1, ง 8, cl. 3. Defendants rely on United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in which the Court held that the Gun-Free School Zones Act of 1990, 18 U.S.C.A. ง 922(q)(1)(A) (1988 Supp. V), prohibiting possession of a firearm in a school zone, exceeded Congress's authority under the Commerce Clause, because the prohibited conduct was not among "those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce."[5]Id. at 558-59, 115 S.Ct. at 1629-30, 131 L.Ed.2d at 637 (citation omitted). However, in Lopez, the Court emphasized that the Gun-Free *976 School Zones Act was "a criminal statute that by its terms has nothing to do with `commerce' or any sort of economic enterprise, however broadly one might define those terms," and noted that states retained primary authority to define and enforce criminal law. 514 U.S. at 561, 115 S.Ct. at 1631, 131 L.Ed.2d at 638. The Court rejected, as too remote, arguments that violent crime affected the national economy, 514 U.S. at 563-64, 115 S.Ct. at 1632, 131 L.Ed.2d at 640, and concluded:
The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce....
To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.
[514 U.S. at 567, 115 S.Ct. at 1634, 131 L.Ed.2d at 642-43.]
See also United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (holding that the civil remedy provision of the Violence Against Women Act of 1994, 42 U.S.C.A. ง 13981(c), exceeded Congress' Commerce Clause power).
More relevant is Russell v. United States, 471 U.S. 858, 862, 105 S.Ct. 2455, 2457, 85 L.Ed.2d 829, 833 (1985), holding that an apartment building that earned rental income fell within the proscription of 18 U.S.C.A. ง 844(i), where the Court observed:
[T]he statute only applies to property that is "used" in an "activity" that affects commerce. The rental of real estate is unquestionably such an activity.... [T]he local rental of an apartment unit is merely an element of a much broader commercial market in rental properties. The congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class.
[Id. at 862, 105 S.Ct. at 2457, 85 L.Ed.2d at 833 (footnote omitted).]
Russell is analogous to the facts presented here. The Ordinance regulates rental properties, and the rental of real estate is an activity that affects commerce. Unlike the crimes at issue in Lopez and Morrison, the summer rental of homes or apartments in Belmar constitutes an economic enterprise. Residential real estate rentals, including seasonal resort properties, is part of a broad commercial market that is not "truly local." Morrison, supra, 529 U.S. at 617, 120 S.Ct. at 1754, 146 L.Ed.2d at 676.
The Court in Lopez acknowledged that " `where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.' " 514 U.S. at 558, 115 S.Ct. at 1629, 131 L.Ed.2d at 637 (quoting Maryland v. Wirtz, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020, 1031 n. 27 (1968)).
Defendants' view that the Ordinance simply applies to the dislocation of specific tenants is myopic. The housing rental market is a matter of national concern, and the Commerce Clause authorizes the regulation, despite what may be perceived to be the minimal character of the dislocation of a specific tenant. Defendants' reasoning that "this is a regulation designed to protect school age children currently in residence, not a regulation of commerce" is also incorrect. It is not the Ordinance that the Commerce Clause authorizes, but the Fair Housing Act. The Act was designed *977 to protect families with children, and in doing so it regulates housing rentals, an activity with a substantial relation to interstate commerce.
This principle was explored recently in Groome Resources Ltd. v. Parish of Jefferson, 234 F.3d 192 (5th Cir.2000). There, the Parish challenged a provision of the Act, 42 U.S.C.A. ง 3604(f)(3)(B), which includes, as unlawful discrimination, "a refusal to make reasonable accommodations" to handicapped buyers or renters. Groome, supra, 234 F.3d at 195. Plaintiff, a business that operated group homes for people with Alzheimer's disease, requested reasonable accommodation in the form of permission to house five people in a group home, when defendant's zoning ordinance allowed only four. Id. at 196. Because of local opposition, the Parish did not act on plaintiff's application. Id. at 197.
The court held that the purchase and rental of residential housing, and plaintiff's proposed operation of its group home, were commercial or economic activity and, citing Jones v. U.S., 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) and Russell, concluded that "renting and otherwise using housing for commercial purposes implicates the federal commerce power." Id. at 206. The court explained that the occurrence of an act of discrimination "on a local stage is of no moment, because when Congress has chosen a national arena to regulate, every actor that affects commerce is subject to regulation." Id. at 211.
The court found the connection between discrimination against the handicapped in housing and interstate commerce strong enough to pass the attenuation test set forth in Lopez and Morrison. Id. at 214-17. The court reasoned:
We do not need to pile "inference upon inference" to see that by refusing to reasonably accommodate the disabled by discriminatory zoning laws, there will be less opportunity for handicapped individuals to buy, sell, or rent homes.... Therefore, the regulation of discriminatory policies in the purchase or rental of housing directly affects the housing industry and the economy.

[Id. at 215.]
This reasoning is applicable here. Seasonal rentals in Belmar are commercial activity, earning profits for plaintiff-owners, just as in Groome. The Ordinance's restriction on seasonal rentals following the tenancy of a family with school-aged children affects the housing rental industry.
Other courts have also concluded that the Commerce Clause authorizes Congress to regulate housing through the Act. Oxford House-C v. City of St. Louis, 77 F.3d 249, 251 (8th Cir.), cert. denied, 519 U.S. 816, 117 S.Ct. 65, 136 L.Ed.2d 27 (1996) (considering a zoning ordinance limiting the number of residents in a group home for recovering substance abusers); Morgan v. Sec'y of HUD, 985 F.2d 1451, 1455-56 (10th Cir.1993) (considering a mobile home park restriction against renting to families with children); Seniors Civil Liberties Ass'n, Inc. v. Kemp, 965 F.2d 1030, 1033-34 (11th Cir.1992) (considering the complaint of senior citizens that the prohibition against discrimination on the basis of familial status violated their rights to freedom of association, liberty, property, and privacy).
In conclusion, we reject defendants' argument that the Act is an invalid exercise of Congress' power under the Commerce Clause.

C.
We now address the merits of defendants' discrimination claim. The judge held that the Ordinance "on its face discriminates against families with schoolaged *978 children." He noted that if a family moved out of a rental in October, "the Ordinance would still literally force the landlord to wait until the end of the academic year to rent for the summer." The judge was concerned that "the Ordinance will discourage winter rentals to families with children and actually prevent them from getting an education in Belmar," noting that defendants failed to demonstrate "that there are no other alternate solutions if summer rentals represent the true source of the problem."
To determine whether there has been discrimination under the Act, we apply the analysis utilized in employment discrimination claims under Title VII of the Civil Rights Act of 1968, 42 U.S.C.A. ง 2000e; the plaintiff must prove either disparate treatment or disparate impact. Harris v. Itzhaki, 183 F.3d 1043, 1051 (9th Cir.1999). We surmise that the judge analyzed the issue as one of disparate impact. To establish a prima facie case of disparate impact, one must demonstrate that a facially neutral practice or policy resulted in a significantly disproportionate or adverse impact on members of the affected class. Pfaff v. HUD, 88 F.3d 739, 745 (9th Cir. 1996) (reversing a determination that a landlord's occupancy limit discriminated on the basis of familial status). Thus, plaintiffs must establish actual discriminatory impact; raising an inference is insufficient. Ibid.
Even though plaintiffs assert that the Ordinance discriminates on its face, they commenced this action within months of the enactment of the Ordinance and before defendants had an opportunity to apply it to the extent that its impact could be measured. Plaintiffs thus did not and could not prove even a prima facie case of disparate impact. Despite this failure of proof, we agree that section 26-7.3 is discriminatory on its face.
Section 26-7.3 imposes disparate treatment upon families with children because of their familial status. It does not grant or protect the freedom from discrimination as set forth in 42 U.S.C.A. ง 3604(b). Although it does not directly affect families with school-aged children, it restricts the use of dwellings rented to such families between the specified dates. This clearly impacts on the terms and conditions of these families' leases. Imposing this different or disparate treatment on units rented to families with school-aged children constitutes a discriminatory housing practice and is invalid under 42 U.S.C.A. งง 3604(b) and 3615.
We have scrupulously required that state and municipal regulations conform to the Act. See, e.g., Borough of Merchantville v. New Jersey Dep't of Human Servs., 325 N.J.Super. 258, 264-66, 738 A.2d 981 (App.Div.1999) (interpreting N.J.S.A. 30:11B-2, which provides for community residences for the mentally ill, to include people with other handicaps, such as recovering alcoholics and substance abusers, in order to avoid discrimination prohibited by the Act); In Re Commitment J.W., 288 N.J.Super. 197, 207-08, 672 A.2d 199 (App.Div.1996) (invalidating N.J.S.A. 30:11B-2 and N.J.S.A. 40:55D-66.2, which prohibit a person found incompetent to stand trial or not guilty by reason of insanity from living in a community group home, as "fatally inconsistent with 42 U.S.C.A. ง 3604" because the Act requires "a careful, individualized consideration of the particular facts justifying their exclusion"); Cherry Hill Township v. Oxford House, Inc., 263 N.J.Super. 25, 55, 621 A.2d 952 (App.Div.1993) (remanding for trial to determine whether the township, through its zoning ordinances, had discriminated against former substance abusers living in group homes, in violation of the Act).
*979 In sum, section 26-7.3 authorizes discriminatory treatment of dwellings rented to families with school-aged children. The legislative construct creates circumstances that potentially inure not only to the detriment of summer landlords, but to the very children defendants purport to protect. Although well-intentioned, such treatment constitutes discrimination on the basis of familial status in violation of 42 U.S.C.A. ง 3604(b). We agree with the trial judge's conclusion that section 26-7.3 violated the Act.

D.
Lastly, as to claims raised under the Act, we reject plaintiffs' assertion that the attorneys' fee award of $18,000 for services rendered with respect to their claims under the Act was inadequate.
We first observe that plaintiffs' Act claim was discrete. In similar circumstances, where fee-shifting claims are combined with non fee-shifting claims, we have suggested that while plaintiffs are entitled to fees, the integration of the various claims is a factor to be considered. Chattin v. Cape May Greene, Inc., 243 N.J.Super. 590, 614, 581 A.2d 91 (App.Div.1990), aff'd o.b., 124 N.J. 520, 591 A.2d 943 (1991); 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J.Super. 449, 470, 547 A.2d 1134 (App.Div.1988). We further note that while plaintiffs prevailed on this aspect of the claim, the overall attack of the Ordinance was generally unsuccessful. This is another relevant factor for consideration.
Ultimately, the issue of counsel fees attributable to this claim was a discretionary determination. The trial judge carefully considered the fee application, noted that counsel's time records did not establish the time expended on the Act claim, and awarded ten percent of the claimed $180,297.15. We find that there was no abuse of discretion, and we affirm the judge's award.

XI.
We now address defendants' contention that the judge erred in holding that the Ordinance sections requiring disclosure of personal information about tenants (names, addresses, telephone numbers, copies of drivers' licenses or other identification, copies of leases if they are in writing, and names and ages of child-occupants) is an invalid invasion of tenants' privacy. Defendants assert that plaintiffs, as landlords, lacked standing to assert the rights of their tenants. They further argue that such compelled disclosures do not violate tenants' privacy because the information is available, and defendants are not required to disclose it to the public.

A.
We quickly dispose of the issue of plaintiffs' standing by recognizing that "New Jersey courts take a broad and liberal approach to standing." New Jersey Citizen Action v. Riviera Motel Corp., 296 N.J.Super. 402, 415, 686 A.2d 1265 (App. Div.1997); New Jersey Chamber of Commerce, supra, 82 N.J. at 67, 411 A.2d 168 ("Entitlement to sue requires a sufficient stake and real adverseness with respect to the subject matter of the litigation. A substantial likelihood of some harm visited upon the plaintiff in the event of an unfavorable decision is needed for purposes of standing." (citation omitted)). Plaintiffs have a substantial stake in the outcome and a likelihood of harm if the decision is adverse to them. If tenants are required to provide personal information to the municipality, it will be more difficult for plaintiffs to find tenants, and the value of plaintiffs' summer rentals may well decrease. Plaintiffs, as owners of the affected properties, are directly involved in the controversy *980 and are significantly adverse with respect to its subject matter. Some of the Ordinance provisions challenged require submission of copies of leases to the municipality. Ordinance งง 26-2.4(d), -3.5(a)(4), and -3.5(b)(5). Plaintiffs are parties to their leases, and submission of leases involves their right to privacy as well as that of their tenants. Plaintiffs are not strangers to the proceedings, and we are satisfied that they had standing to challenge this provision of the Ordinance.

B.
The judge invalidated the following provisions of the Ordinance:
Applications for certificates of inspection must include both (1) a copy of the lease, if there is a written lease, "executed by all adult persons who will be tenants"; the applicant may redact the rent amount, Ordinance ง 26-2.4d; and (2) an affidavit of each tenant stating:
i. whether he or she maintains a residence elsewhere, and providing the full address thereof;
ii. providing a true and correct copy of his or her driver's license or if not available alternative proof of identification;
iii. listing the names of all minors who will occupy the dwelling unit, and the ages of each child as of the date of the application.

[Ordinance ง 26-2.4e.]
We note that applications for public accommodations licenses for hotels and motels must include the names and addresses of all tenants, and a copy of the lease if it is in writing (monetary amounts may be redacted), Ordinance ง 26-3.5a.4, while applications for summer rental licenses must include: (1) "[t]he names and mailing addresses of all tenants and of all adult persons who are tenants," Ordinance ง 26-3.5b.1.iv, or when a special license is issued, covering short-term rentals for thirty-one days or less, the applicant must provide the identities of new tenants and the dates of their occupancy, Ordinance ง 26-3.4; (2) a copy of the lease if it is in writing, with the option to delete the amount, Ordinance ง 26-3.5b.5; (3) an affidavit of each tenant "stating whether he or she maintains a residence elsewhere, providing the full address and telephone number thereof, [and] stating whether the other address is his or her permanent address," as well as "[a] copy of the tenant's driver's license or if not available such alternative proof of identification," Ordinance ง 26-3.5b.6; (4) an affidavit of each tenant substantially as follows:
I HEREBY ACKNOWLEDGE that the maximum permitted occupancy of this Summer Rental is ______ persons. I understand that occupancy by a number of persons greater than this maximum limit between the hours of 1:30 a.m. and 8:30 a.m. is a violation of Borough Ordinance and shall result in the issuing of a summons....
I further understand that Summer Rental occupancy limits are strictly enforced, and that they apply to all occupants of Summer Rentals regardless of whether they are tenants or guests.

[Ordinance ง 26-3.5b.7.]
Anyone who becomes a tenant after the issuance of a summer rental license must also submit this affidavit unless a special license for short-term rentals is issued in accordance with Ordinance section 26-3.4. Ordinance ง 26-3.1a.
Defendants' justification for requiring this information was that a copy of the lease was necessary to determine whether it "would fall under the enabling authority," which depended on the period of the tenancy. Also, it was necessary to ascertain whether any children would be residing *981 in a rental unit, so that the Borough could determine whether its restriction on such rentals was applicable.
According to Pringle, the Borough obtained the names of tenants to require them to "sign off on a disclosure as to what the occupancy was," which would prevent occupancy violations. "The whole point of this process is to make sure that every person that pays money to live in a summer rental in Belmar, is told what the occupancy is .... [and] the hours during which it was going to be enforced."
The judge determined that the required information "implicate[s] privacy interests"; it could "provide details of familial relationships and other intimate living arrangements." Yeager v. Hackensack Water Co., 615 F.Supp. 1087, 1092 (D.N.J. 1985). Balancing Belmar's legitimate "interest in protecting itself from the problems caused by summer residents" against "individuals' privacy rights," he concluded that the disclosure requirements of the Ordinance were
not narrowly tailored to the end sought to be achieved. The Borough is essentially attempting to curb the rowdiness type behavior caused by summer residents indirectly by requiring them to provide the Borough with private information. However, the Borough does not need to know the names of tenants or their addresses or other personal information to enforce an occupancy limit.
Yeager is particularly instructive. In Yeager, defendant-water company demanded the names and social security numbers of residents of homes to which it supplied water, to ration water according to the number of people in the home, in accordance with a state drought emergency program. Id. at 1089. The court held that the demand for social security numbers violated the Privacy Act of 1974, 5 U.S.C.A. ง 552a. 615 F.Supp. at 1089-92.
Regarding the names of residents, the court determined that "the right to be free from compelled disclosure of the names of household members is within the right of privacy which has been recognized by the courts." Id. at 1092. The water company alleged that the names were necessary "to verify the number of water users," in order to determine whether rations were being exceeded. Id. at 1092-93. The court acknowledged the state's "substantial interest in alleviating the water emergency," but determined that "there exist[ed] less intrusive methods by which defendants might achieve their objectives. Contrary to their assertions, defendants [showed] no evidence that individuals, if asked, would intentionally misrepresent the number of household members." Id. at 1093.
In Doe v. Poritz, 142 N.J. 1, 662 A.2d 367 (1995), the Supreme Court upheld the disclosure requirements of the Registration and Community Notification Laws, N.J.S.A. 2C:7-1 to -11 (Megan's Law), against a challenge that public disclosure of private information related to convicted sex offenders invaded their privacy rights. 142 N.J. at 77-91, 662 A.2d 367. The Court explained that the initial inquiry was whether "plaintiff has a reasonable expectation of privacy in the information disclosed." Id. at 78, 662 A.2d 367. If plaintiff did have such a reasonable expectation, "we must decide whether the intrusion on the right of privacy is justified, balancing the governmental interest in disclosure against the private interest in confidentiality." Ibid.
The Court analyzed each item of information that the provisions required to be disclosed and determined that plaintiff had no reasonable expectation of privacy in most of the items because they were readily available to the public. Id. at 79-83, 662 A.2d 367. The Court noted that the records *982 of the Division of Motor Vehicles, which included the applicant's address, were public records under N.J.S.A. 47:1A-2. 142 N.J. at 80, 662 A.2d 367. Despite its public availability, the Court held that disclosure of a home address implicated privacy interests, because it might result in unsolicited contact. Id. at 82-84, 662 A.2d 367. The Court also held that "a privacy interest is implicated when the government assembles those diverse pieces of information into a single package and disseminates that package to the public." Id. at 87, 662 A.2d 367.
Nevertheless, on the other side of the equation, the Court said: "The state interest in protecting the safety of members of the public from sex offenders is clear and compelling." Id. at 89, 662 A.2d 367. The Court noted that "the degree and scope of disclosure is carefully calibrated to the need for public disclosure: the risk of reoffense." Ibid.
In reference to this Ordinance, we have held that the restrictions on rentals to tenants with school-aged children violate the Fair Housing Act; that conclusion places in substantial issue whether Belmar has any legitimate interest in obtaining the names and ages of children who will occupy dwelling units. We answer that query in the negative and conclude that Ordinance section 26-2.4e.iii, requiring this information, is unnecessary.
In addition, the judge invalidated the requirement of the tenant's affidavit acknowledging the rental's maximum permitted occupancy as a violation of tenants' right to privacy. However, we observe that the proposed affidavit does not implicate any privacy rights because it does not state any private facts about tenants. Cf. Doe, supra, 142 N.J. at 78, 662 A.2d 367. Requiring tenants to execute this affidavit thus does not infringe on their right to privacy, and the judge erred in voiding this requirement.[6]
As the Court pointed out in Doe, drivers' licenses or other identification are "records which are required by law to be made, maintained, or kept on file," and are thus are public records under N.J.S.A. 47:1A-2. See 142 N.J. at 80, 662 A.2d 367. However, despite the availability of home addresses, their disclosure implicates privacy interests. Id. at 82-84, 662 A.2d 367. In addition, neither unlisted telephone numbers nor copies of leases are public records or otherwise available to the public. Tenants and plaintiffs thus have a reasonable expectation of privacy of this information.
Defendants argue that the Borough does not disclose the information to the public. Nor does it compile "diverse pieces of information into a single package." Names, addresses, and identification do not constitute confidential or private information. Unlisted telephone numbers and leases seem more worthy of confidentiality.
Belmar has established no interest in disclosure. Defendants have failed to explain why it is necessary to review an entire lease to determine its term. As the court said in Yeager, there are less intrusive methods for obtaining this information; license applicants would supply it when asked. See 615 F.Supp. at 1093. Nor have defendants stated any reason for requiring addresses, telephone numbers, or document identification of tenants. Pringle explained that the Borough obtained the names of tenants to require *983 them to "sign off on a disclosure as to what the occupancy was," which would prevent occupancy violations. However, addresses, telephone numbers and identification are not necessary to obtain a signed occupancy disclosure.
Under Ordinance section 26-3.5b.7, applications for summer rental licenses must include tenants' affidavits acknowledging occupancy restrictions. Such a requirement precludes defendants' need to contact tenants to inform them of occupancy limits or to obtain this signed disclosure. It is provided with the application for the summer rental license. The judge was correct that defendants "need not know the names or addresses of tenants in order to enforce occupancy limits," and that the Ordinance requirements are "not narrowly tailored to the end sought to be achieved."
In conclusion, the judge erred in voiding that portion of Ordinance section 26-3.5b.7, requiring tenants to submit affidavits acknowledging their rentals' occupancy limits, because it does not violate any right to privacy. The judge properly invalidated all the other Ordinance provisions requiring disclosure of information about tenants and copies of leases, as a violation of plaintiffs' and tenants' right to privacy.

XII.
The Ordinance contains a provision, Ordinance section 26-3.7, prohibiting temporary certificates for summer rentals. The judge held that this provision was unconstitutional. We disagree and reverse.
Ordinance section 26-3.7 provides:
No Summer Rental License or Public Accommodations License shall be issued by the Code Official unless the dwelling unit or premises, as appropriate, has first been inspected and determined to be in full compliance with the Code, and the requirements of Chapter XXVI. No temporary or conditional certificates of inspection or conditional licenses shall be issued in connection with any Summer Rental License or Public Accommodations License.
This section goes on to allow temporary certificates of inspection for dwelling units "subject to the restriction set forth in Section 26-7.3."
Various property owners complained that minor violations such as dirty windows, dirty carpets, a window sill requiring painting, two different colors of paint on soffits, untrimmed hedges, a crack in the sidewalk, a crack in a corner of a window, or rust on a can of shaving cream in a medicine cabinet prompted license denials.
The judge found:
A minor violation leads to a denial of a Summer Rental License. This Court finds no rational basis for the Borough's position that no temporary or conditional licenses will be issued to summer rentals, simply because of past violations by some summer landlords. Certainly, the Borough can cite landlords for noncompliance if violations are not corrected by the expiration of the license and deny any extensions.
The judge added that he "does not find any problems with a conditional Certificate being issued for 20 days or less to accommodate the Borough's concern that the defects be quickly corrected. The Court simply finds a constitutional problem with ง 26-3.7 as currently formulated."
Although not fully articulated, the parties apparently focused on equal protection principles in support of the constitutional claim, as the argument is not "that the legislative means are forbidden, but that the Legislature must write evenhandedly." Greenberg, supra, 99 N.J. at 562, 494 A.2d 294. Because no fundamental right or suspect *984 class is involved, "the legislative classification need only be rationally related to a legitimate interest." Id. at 564, 494 A.2d 294.
Defendants cite N.J.S.A. 40:48-2.12m, which authorizes municipalities to regulate "the maintenance and condition" of residential rentals "for the purpose of the safety, healthfulness, and upkeep of the structure and the adherence to such other standards of maintenance and condition as are required in the interest of public safety, health and welfare." The statute provides for certificates of inspection or occupancy prior to rental, which "shall be issued by the municipality upon the inspection of the unit of dwelling space by a municipal inspector and his finding that such unit meets the standards provided by law."
Defendants argue that the full compliance requirement of Ordinance section 26-3.7 "is specifically allowed by" this statute. Plaintiffs have cited no statutory or other right to temporary certificates. The statutory scheme does not provide for temporary certificates to allow owners a period of time to correct minor violations. Instead, it provides that certificates of inspection or occupancy be issued upon the finding of the municipal inspector that the unit meets the applicable standards. This is exactly what Ordinance section 26-3.7 accomplishes.
Plaintiffs argue that minor violations do not impact health and safety. However, N.J.S.A. 40:48-2.12m is not limited to violationsโit also speaks to "upkeep of the structure" and adherence to "standards of maintenance." Alleged minor items such as dirty and garbage-strewn premises, uncut lawns and cracked windows are health hazards to varying degrees. Inoperative smoke detectors, a minor item according to one property owner, clearly constitutes a safety hazard under any reasonable interpretation.
We accept as reasonable defendants' explanation for precluding temporary certificates for summer rentals. The summer rentals are, by definition, relatively short term leases. There is a time-gap between identifying the violation, repair, inspection, and inception of the lease. The Borough determined to make the inspections at an earlier date and eliminate the need for temporary certificates. This approach is a rational, reasonable, and sufficient shield against a constitutional challenge. We conclude that the judge erred in holding Ordinance section 26-3.7 unconstitutional. It was rationally related to the legitimate purpose of ensuring full compliance with housing maintenance requirements.

XIII.
The judge invalidated Ordinance section 26-7.12 prohibiting commercial signs and strings of electric lights, as a violation of summer tenants' First Amendment right to free speech. Defendants contest the judge's determinations that the Ordinance restricted noncommercial speech and that it was content-based. They also argue that strings of lights left on all week are a fire hazard.
Ordinance section 26-7.12 provides:
It shall be unlawful for any person to affix to, hang from, or otherwise display on the exterior of any structure or premise containing a Summer Rental Licensed dwelling unit during any period the license is in effect, any sign, advertisement, banner, poster, cut-out figure or other display advertising a commercial product or service, or to display strings of electric lights. Nothing contained in this section 26.7.12 shall be construed to prohibit or otherwise restrict advertising of the rental of a Summer *985 Licensed dwelling unit in accordance with this Code.
The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. It applies to the states through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L. Ed. 1213, 1218 (1940); Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 264, 716 A.2d 1137 (1998), cert. denied, 527 U.S. 1021, 119 S.Ct. 2365, 144 L. Ed.2d 770 (1999).

A.
The primary complaint prompting the limitation on signs was the proliferation of "placards and signs and cutouts" that were "pasted all over the front of rental properties." Many of these signs advertised various beers. The signs were located in primarily residential zones and were characterized as "a culturally positive thing for group rental properties to do," but "inappropriate in residential neighborhoods."
The judge found that the restriction on signs was
not a "commercial speech" restriction. The restriction [a]ffects residential housing, not commercial enterprises. Although the signs are commercial in nature, they are not displayed for commercial purposes, rather they are presumably displayed as a form of expression....
The signage prohibitions in the regulation are content-based. The regulation is aimed at the content of signs because the regulation does not restrict all signs, but only signs that advertise "a commercial product or service."
The judge concluded that because the restriction was content-based and applied to noncommercial speech, it was presumed invalid and defendants failed to present evidence to overcome this presumption. " `Eye-sore' concerns can be addressed through regulating the physical characteristics of the signs." We disagree with this finding and reverse this determination.
Plaintiffs are incorrect that the Ordinance "includes both commercial and noncommercial speech" because it prohibits "a political or religious advertisement." The Ordinance prohibits only displays "advertising a commercial product or service," except for rental advertising. Ordinance ง 26-7.12. It does not bar political or religious messages.
The Supreme Court recently considered whether restrictions on commercial speech violated the First Amendment in Hamilton, supra, 156 N.J. 254, 716 A.2d 1137. There, plaintiffs challenged N.J.S.A. 2C:34-7c, which restricted the size, number and content of signs that sexuallyoriented businesses could display. Id. at 262-63, 716 A.2d 1137.
The Court applied two tests for determining whether the regulation violated the First Amendment. The first was a fourpart inquiry: (1) whether the regulated speech concerned unlawful conduct or is misleading; (2) "whether the asserted governmental interest is substantial," and, if so; (3) "whether the regulation directly advances the governmental interest asserted, and"; (4) whether the regulation "is no more extensive than is necessary to serve that interest." Id. at 267, 716 A.2d 1137 (quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 566, 100 S.Ct. 2343, 2350, 65 L. Ed.2d 341, 351 (1980)). The second and overlapping test was whether "time, place and manner restrictions" were justified without regard to the content of the speech, advanced a significant governmental interest, and left alternative means of communication open. Id. at 267-68, 716 A.2d 1137.
*986 We disagree with the judge's conclusion that the regulation is contentbased because it "does not restrict all signs, but only signs that advertise `a commercial product or service.' " The judge did not specify whether he considered the Ordinance content-based because it regulated only some commercial speech, or because it regulated only commercial speech. The prohibition against signs advertising a commercial product or service, set forth in the Ordinance, encompasses all commercial signs. Regulation of all commercial speech cannot be considered content-based because it does not include noncommercial speech; although many regulations cover both, where they do not, we consider the two categories separately.
In Hamilton, the Court rejected the argument that the statute applied "beyond the commercial context." Id. at 266, 716 A.2d 1137. Acknowledging that outdoor signs were used to convey political and social messages, the Court noted that "plaintiffs ... made no showing of actual noncommercial use." Ibid. Nevertheless, even though it regulated only commercial speech, the Court held that the statute in issue was not content-based. Id. at 268, 716 A.2d 1137.
Here too, application of the Ordinance only to commercial speech does not render it content-based. Nor does the exception for rental signs render the prohibition content-based. The United States Supreme Court has determined that a municipality may not prohibit "for sale" signs on homes because alternative channels for communication are inadequate, and the prohibition "restrict[s] the free flow of truthful information." Linmark Assocs., Inc. v. Township of Willingboro, 431 U.S. 85, 92-95, 97 S.Ct. 1614, 1618-20, 52 L.Ed.2d 155, 161-63 (1977). New Jersey courts have also invalidated prohibitions against or severe restrictions on "for sale" signs on residences. Berg Agency v. Township of Maplewood, 163 N.J.Super. 542, 395 A.2d 261 (Law Div.1978); Schoen v. Township of Hillside, 155 N.J.Super. 286, 382 A.2d 704 (Law Div.1977).
In Hamilton the Court explained: "A statute or ordinance is considered to be content-neutral when the legislature's predominant concern is with adverse secondary effects, such as those caused by sexually oriented businesses, and not with the content of the speech being restricted." 156 N.J. at 268, 716 A.2d 1137. Here, Belmar's concern was not with the content of the prohibited advertising signs, but with their adverse secondary effects in residential neighborhoods, i.e., their appearance, or "eye-sore," as the judge put it.
Appearance is a valid governmental objective. In City of Ladue v. Gilleo, 512 U.S. 43, 54, 114 S.Ct. 2038, 2044-45, 129 L.Ed.2d 36, 46 (1994), invalidating a nearly total ban on residential signs, the Court recognized that "the City's interest in minimizing the visual clutter associated with signs" was a "concededly valid" interest. Similarly, in State v. Miller, 83 N.J. 402, 409, 416 A.2d 821 (1980), invalidating another virtually complete ban on signs in residential zones, the Court, noting that "clean, salubrious neighborhoods contribute to psychological and emotional stability and well-being as well as stimulate a sense of civic pride," held that "a zoning ordinance may accommodate aesthetic concerns." See also Bell v. Township of Stafford, 110 N.J. 384, 396, 541 A.2d 692 (1988) (acknowledging "preserving aesthetics" as a legitimate municipal goal, while invalidating a nearly total ban on both commercial and noncommercial signs). A prohibition against commercial signs furthers this goal.
Finally, Ordinance section 26-7.12 is no more restrictive than necessary and leaves *987 open alternate channels for communication. It applies only to summer rentals during the periods that their licenses are in effect, which focuses on the problem. Summer renters may express themselves by exhibiting any type of noncommercial sign they choose, as Ordinance section 26-7.12 prohibits only commercial signs. The prohibition on commercial signs at summer rentals is no more restrictive than necessary to preserve the character and aesthetics of residential neighborhoods.
Our courts have upheld zoning bans on commercial or advertising signs. In United Advertising Corp. v. Borough of Metuchen, 42 N.J. 1, 3, 198 A.2d 447 (1964), the Court upheld a ban throughout the municipality on "outdoor advertising signs other than those related to a business conducted on the premises." The plaintiff sought to erect billboards in business and manufacturing districts. Ibid. The Court held that the "aesthetic impact of billboards is an economic fact which may bear heavily upon the enjoyment and value of property. It is a relevant zoning consideration." Id. at 6, 198 A.2d 447.
In State v. J & J Painting, 167 N.J.Super. 384, 400 A.2d 1204 (App.Div.1979), we upheld an ordinance prohibiting contractors' signs in residential districts. The defendant-contractors claimed that the ban on posting their business signs at homes on which they were performing work violated their rights to free speech and equal protection. Id. at 385-86, 400 A.2d 1204. We rejected this argument: "The ordinance regulation is a reasonable one and, fundamentally, simply prohibits the carrying on of a purely commercial activity in a residential zone restricted against such usesโlong a valid zoning proscription." Id. at 386, 400 A.2d 1204. We concluded that the prohibition "serves legitimate municipal zoning functions in the protection of real estate values and considerations of aesthetics." Id. at 386-87, 400 A.2d 1204.
Here also, the ban on advertising signs at summer rentals prohibits commercial activity in a residential zone. It leaves all other means of advertising, as well as personal expression open, and advances the legitimate governmental purpose of promoting aesthetics.
In conclusion, the judge erred in invalidating the prohibition against commercial signs set forth in Ordinance section 26-7.12.

B.
The prohibition against lights was also based on aesthetic and safety concerns. The Borough established a rational basis for the prohibition against strings of lights, that is, they constituted a fire hazard. This assertion was unrefuted; it is the only evidence in the record on this issue. Plaintiffs failed in their burden of proving that the prohibition against strings of lights was unreasonable; they submitted no evidence.
The Ordinance enjoys a presumption of validity. Dome Realty, supra, 83 N.J. at 235, 416 A.2d 334. The rational basis of fire-safety justifies it. Mannie's Cigarette Serv., supra, 259 N.J.Super. at 347-48, 613 A.2d 494. The judge erred in invalidating this provision.

XIV.
We now address the common issue raised in both the United Property Owners' appeal (A-2938-99T5) and the Zampetti appeal (A-40-00T5)โthe propriety of Ordinance section 26-11.3a, permitting the Borough to impose a bond requirement on landlords whose tenants have acted in a repeatedly disorderly manner as defined by the Ordinance.
*988 Our consideration of the issue requires us to summarily set forth the procedural and factual background of the Zampetti appeal. The Zampettis, owners of property in defendant Belmar, leased their property to summer tenants in 1997, two of whom were issued three summonses and pled guilty to violations of Belmar's noise ordinance. Belmar instituted a proceeding to require plaintiffs to post a bond to insure future compliance, pursuant to Belmar Ordinance section 26-11 and its enabling act, N.J.S.A. 40:48-2.12n-r. After a hearing, Belmar's hearing officer required plaintiffs to post a $1500 bond. Plaintiffs contested this decision, and the trial judge affirmed.
Plaintiffs appeal, contending that: (1) Ordinance section 26-11 is void because it does not conform to the enabling act; (2) both the Ordinance and the enabling act deprive plaintiffs of their right to due process, and the enabling act constitutes special legislation; and (3) defendant failed to prove that a bond was necessary. All of the issues raised in the United Property Owners' appeal were raised by the Zampettis as well. We reject these arguments and affirm the judge's determination that the bonding requirement is lawful.
Plaintiffs argue that the judge erred in failing to determine that Ordinance section 26-11 is invalid because it "includes tenant offenses," i.e., excessive noise, "that are not authorized" by the enabling act. Plaintiffs reason that the Ordinance is "contrary to State law" and thus void.
The Legislature determined that:
a. Many of the shore resort communities in this State ... have experienced disturbances, damage and public expense resulting from carelessly granted and inadequately supervised seasonal rentals to irresponsible vacationers by inept or indifferent landlords.
b. To preserve the peace and tranquility of those communities ... it is necessary and desirable that those communities have adequate means to curb and discourage those occasional excesses arising from irresponsible seasonal rentals.
c. Accordingly, it is the purpose of this legislation to enable such communities to take effective action to assure that excesses, when they occur, shall not be repeated, and that landlords offering seasonal rentals be held to sufficient standards of responsibility.

[N.J.S.A. 40:48-2.12n.]
To accomplish this goal, N.J.S.A. 40:48-2.12p.a, authorizes municipalities in fifthor sixth-class counties to enact ordinances requiring such landlords to post a bond, "under certain circumstances, as hereinafter in this act described ... against the consequences of disorderly behavior of their tenants."
These circumstances are described in N.J.S.A. 40:48-2.12q:
An ordinance adopted under authority of this section shall provide:
a. If in any one year a specified number, which shall not be less than three,[7] of complaints, on separate occasions, of disorderly, indecent, tumultuous or riotous conduct upon or in proximity to any seasonal rental premises, and attributable to the acts ... of any of the tenants of those premises, have been substantiated... the municipal governing body *989 ... may institute proceedings to require the landlord to post a bond against the consequences of future incidents of the same character.
Belmar Ordinance section 26-11 substantially mirrors this enabling act. The section to which plaintiffs object, 26-11.3a, provides:
If in any one (1) year, three (3) substantiated complaints ... of disorderly, indecent, tumultuous or riotous conduct, including by way of example, but not limited to, simple assault, assault, terroristic threats, harassment, lewdness, urinating in public, criminal mischief, or excessive noise, upon or in proximity to any seasonal rental premises, and attributable to the acts ... of any of the tenants of those premises, have been substantiated ... the Borough Council... may institute proceedings to require the landlord of the seasonal rental premises to post a bond against the consequences of future incidents of the same character.
Plaintiffs claim that because the enabling act, N.J.S.A. 40:48-2.12q.a, includes only "disorderly, indecent, tumultuous or riotous conduct" as the subject of complaints that can result in the initiation of a bond proceeding, the inclusion of "excessive noise" in this category in Ordinance section 26-11.3a is unauthorized, improper, and contrary to the statute. The judge concluded that the Ordinance "has not gone too far. Even though the enabling act does not list `excessive noise' as grounds for a complaint, this Court finds that the `substantiated complaint' definition includes `excessive noise,' which is a form of disorderly conduct."
Plaintiffs invoke the doctrine of expressio unius est exclusio alterius, "the express mention of one thing necessarily implies the exclusion of all others." In re K.L.F., 275 N.J.Super. 507, 517, 646 A.2d 532 (Ch.Div.1993). They argue that the Legislature's failure to specify "excessive noise" in N.J.S.A. 40:48-2.12q.a precludes defendant from including excessive noise in its Ordinance.
The list of offenses in N.J.S.A. 40:48-2.12q.a, "disorderly, indecent, tumultuous or riotous conduct," sets forth "a general type of conduct" rather than an exclusive list of particular offenses with the intent to exclude all others. If the Legislature had intended a list of specific offenses, it would have listed specific offenses. See, e.g., N.J.S.A. 2C:25-19 (setting forth those specific statutory offenses constituting domestic violence). It would not have used the general term "conduct," and it would have included references to the criminal code.
According to plaintiffs, the Legislature intended that the offenses which may cause the initiation of a bond proceeding "must rise to the level of `disorderly conduct,' as defined by N.J.S.A. 2C:33-2a and b, or `riot,' as defined by N.J.S.A. 2C:33-1a." Fighting, violent or tumultuous behavior, threatening, creating a hazard, and offensive language are prohibited under N.J.S.A. 2C:33-2(a) and (b).
Plaintiffs note that N.J.S.A. 2C:33-2(b) also prohibits noise, but its scope is much narrower than that set forth in Belmar Ordinance section 16-3.1. Under the statute, the prohibited noise must be not only unreasonably loud, but also offensively coarse or abusive and intended to offend.
Under the Ordinance, the prohibited noise may be merely "loud, unnecessary or unusual." The Ordinance also specifies that a loud, disturbing and unnecessary noise includes the playing or operating of a radio, phonograph or other sound-producing device "in such manner or volume as to cause a noise disturbance to others in the vicinity." Ordinance ง 16-3.2c. A noise disturbance is a sound which annoys or *990 disturbs a reasonable person, or which "injures or endangers the comfort, repose, health, hearing, peace or safety of other persons." Ordinance ง 16-3.1.
Plaintiffs' thesis that an offense must rise to the level of disorderly conduct or riot under N.J.S.A. 2C:33-1 and -2 to cause the commencement of a bond proceeding would render the terms "indecent" and "tumultuous" in N.J.S.A. 40:48-2.12q.a superfluous. There is no offense for either tumultuous or indecent conduct in the criminal code, although the word tumultuous is part of the description of disorderly conduct. N.J.S.A. 2C:33-2a(1). Ordinarily, we assume that the Legislature intends "that the words of a statute have a meaning that is not superfluous or irrelevant." Phillips v. Curiale, 128 N.J. 608, 618, 608 A.2d 895 (1992).
Although excessive noise does not qualify as disorderly conduct under N.J.S.A. 2C:33-2b, unless it consists of coarse or abusive language, it falls within the rubric of tumultuous. Tumult is defined as either "uproar" or "violent agitation of mind or feelings." Webster's New American Dictionary 555 (Smithmark 1995). Excessive noise could qualify as an uproar or a violent agitation to the victim.
In addition, the Legislature declared that its intent in enacting N.J.S.A. 40:48-2.12n-r was "[t]o preserve the peace and tranquility" of shore resort communities. N.J.S.A. 40:48-2.12n.b. Including excessive noise as one of the types of predicate conduct for a bond proceeding comports with this intent.
Another statutory provision supports this result. The amount of the bond must be adequate "to make reparation for ... damages consequent upon disruption of affected residents' rights of ... quiet possession of their premises." N.J.S.A. 40:48-2.12q.d. The inclusion of disruption of quiet possession as a harm justifying damages denotes a legislative intent to include noise among the disturbances it empowered municipalities to curb and discourage.
The judge did not err in declining to declare Ordinance section 26-11 invalid. The Ordinance includes excessive noise as a tenant offense that could cause the commencement of a bond proceeding against the landlord, and such conduct is included within the scope of the enabling act.
We reject, without further comment, plaintiffs' assertion that the Ordinance is invalid because it failed to specify that the municipality may be heard at the hearing provided for in the Ordinance. While we agree with the judge that this Ordinance provision was inartfully and carelessly drafted, "the clear intent of the [Ordinance] was to provide for an appropriate hearing." Because we determine that plaintiffs' argument is without merit, we need not address plaintiffs' standing to raise this issue or explore the issue in any greater depth.
We likewise reject plaintiffs' argument that the judge erred in failing to invalidate Ordinance section 26-11 and N.J.S.A. 40:48-2.12n-r on the ground that they violated plaintiffs' right to substantive due process under the New Jersey Constitution. Plaintiffs complain that the act and Ordinance improperly hold landlords liable for their tenants' misdeeds, serve no legitimate governmental purpose, and indirectly prohibit group rentals.
Citing Rivkin, plaintiffs assert that "[s]ubstantive due process under the Fourteenth Amendment provides more limited protection of property interests," than substantive due process under the New Jersey Constitution. In Rivkin, the Court considered only the Fourteenth Amendment, not the New Jersey Constitution, and it stressed the availability of other *991 remedies. Rivkin, supra, 143 N.J. at 363-71, 671 A.2d 567 (rejecting plaintiff-property owners' federal civil rights claim, under 42 U.S.C.A. ง 1983, that defendant-rent leveling board deprived them of their property without due process, on their application for a rent increase, when one of its members was flagrantly biased and the rest of the board refused to disqualify him). The Court commented that "substantive due process is reserved for the most egregious governmental abuses against liberty or property rights," such as extreme cases of "intrusions on an individual's privacy and bodily integrity." Id. at 366, 671 A.2d 567. The Court held that the board's conduct did not "rise to the level of a substantive due process violation under the Supreme Court's standards." Ibid.
Prior to Rivkin, our Supreme Court used the same, more lenient standard for substantive due process challenges under both the State and Federal Constitutions; the challenged regulation only had to be rationally related to a legitimate governmental objective. Fanelli v. City of Trenton, 135 N.J. 582, 592-94, 641 A.2d 541 (1994) (an ordinance prohibiting pushcart peddling in a Special Improvement District did not violate due process); Holmdel Builders Ass'n v. Township of Holmdel, 121 N.J. 550, 581-82, 583 A.2d 277 (1990) (ordinances imposing fees dedicated to affordable housing on developers did not violate due process, but were subject to approval by the Council on Affordable Housing); Taxpayers Ass'n of Weymouth Township v. Weymouth Township, 80 N.J. 6, 44-45, 364 A.2d 1016 (1976), cert. denied, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977) (a zoning ordinance allowing a mobile home park for the elderly did not violate due process).
The distinction between the appropriate standards makes little difference, as plaintiffs' claim fails under either the strict standard set forth in Rivkin or the more lenient standard. Under the standard set forth in Rivkin, imposing limited liability on landlords for the actions of their tenants does not intrude on anyone's privacy or bodily integrity and is not an egregious governmental abuse. 143 N.J. at 366, 671 A.2d 567. Like the conduct of the biased board member in Rivkin, N.J.S.A. 40:48-2.12n-r and Ordinance section 26-11 do not rise to the level of a due process violation.
The Court set forth the pre-Rivkin standard in Board of Education of Piscataway Township v. Caffiero, 86 N.J. 308, 431 A.2d 799, appeal dismissed, 454 U.S. 1025, 102 S.Ct. 560, 70 L.Ed.2d 470 (1981): "Due process requires `only that a law shall not be unreasonable, arbitrary or capricious, and that the means selected bear a relation to the legislative object sought to be obtained.'" Id. at 318, 431 A.2d 799 (quoting Robson v. Rodriquez, 26 N.J. 517, 522, 141 A.2d 1 (1958)).
Plaintiffs argue that "the bonding requirement fails to advance a legitimate governmental purpose, and is merely punitive, because there is no real possibility that a court would impose vicarious liability on ... landlords for their tenant[s'] actions." Plaintiffs complain that the statutory scheme is unfair to them because they have no right to participate in the municipal court actions against their tenants, yet are bound by the results; they could not have known of the convictions until after the summer rental season; and neither the statute nor the Ordinance provided them with guidance on what they should do when there are complaints against tenants.
Plaintiffs' argument is flawed. The Court in Piscataway held that a legislative judgment to impose vicarious liability does not violate substantive due process. 86 *992 N.J. at 317-21, 431 A.2d 799. Upholding N.J.S.A. 18A:37-3, which imposed liability on parents for damages to school property caused by their children, the Court said: "Due process does not restrict legislative imposition of liability to situations in which a defendant or his agent is at fault. Other considerations may warrant the imposition of liability and a statute will be struck down only if it operates arbitrarily or capriciously." Id. at 319, 431 A.2d 799.
The Court determined that the legislative purposes of compensating the public and deterring delinquent behavior were not
unreasonable and therefore an invalid basis for imposition of vicarious liability. As long as the means chosen by the Legislature have a rational relation to obtaining the objective sought, the statute will not be in violation of due process as an arbitrary or capricious enactment.
The existence of the parent-child relationship provides a rational basis for imposing liability and is a reasonable means to accomplish the purposes of compensation and deterrence.
[Id. at 319-20, 431 A.2d 799.]
Here also, the statute and ordinance advance the legitimate legislative goal of compensation and deterrence. The legislative intent is "to curb and discourage" the "disturbances, damage and public expense" that result from "irresponsible summer rentals." N.J.S.A. 40:48-2.12n.a, b.
The landlord-tenant relationship constitutes a rational basis for imposing liability. Holding landlords liable will force them to regulate and supervise their summer rentals more closely. See also Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55, 67-72, 159 A.2d 97 (1960) (imposing strict liability under N.J.S.A. 6:2-7 on an aircraft owner for damages caused by its operation did not violate the owner's right to due process); Torchia v. Fisher, 95 N.J. 43, 47-49, 468 A.2d 1061 (1983) (upholding the same statute against the same claim, when the aircraft was stolen).
Plaintiffs cite Baker, supra, 81 N.J. at 106-14, 405 A.2d 368 (invalidating a zoning ordinance that restricted residency on the basis of the number of unrelated persons), Berger v. State, 71 N.J. 206, 223-27, 364 A.2d 993 (1976) (invalidating a zoning ordinance that unduly restricted the definition of family), and Kirsch, supra, 59 N.J. at 251-52, 281 A.2d 513 (invalidating an ordinance prohibiting rentals to unrelated groups). Plaintiffs argue that N.J.S.A. 40:48-2.12n-r and Ordinance section 26-11 "constitute an indirect attempt to interfere into" the "private areas" protected by these decisions and do an "end run" around due process principles.
However, the statute and ordinance here do not limit residency on the basis of family status and do not pertain to this "private area" in any way. They seek to prevent and compensate the community for "disorderly, indecent, tumultuous or riotous conduct," and plaintiffs do not challenge the legitimacy of this stated goal.
Plaintiffs complain that N.J.S.A. 40:48-2.12n-r improperly goes beyond the "vigorous and persistent enforcement of general police power ordinances and criminal statutes" that the Court in Kirsch suggested as a means to control "obnoxious personal behavior." 59 N.J. at 253, 281 A.2d 513. However, Kirsch did not place any limit on legislation enabling municipalities to control the "public and private nuisance" of summer group rentals in shore communities. Id. at 245, 281 A.2d 513. To the contrary, the Court said: "We are entirely sympathetic to the community desire to prevent one segment of the summer population from so adversely affecting other vacationers and permanent residents, as *993 well as the municipality as a whole, by their conduct." Id. at 253, 281 A.2d 513. The Legislature has empowered municipalities to accomplish this goal in N.J.S.A. 40:48-2.12n-r. Cf. Apartment House Council v. Mayor of Ridgefield, 123 N.J.Super. 87, 92-93, 301 A.2d 484 (Law Div.1973), aff'd o.b., 128 N.J.Super. 192, 319 A.2d 507 (App.Div.1974) (upholding an ordinance requiring owners of multiple dwellings to post security to be used for emergency repairs which the landlord fails to perform, and noting that the ordinance was an exercise of the police power to "abate conditions which are harmful to health and safety").
N.J.S.A. 40:48-2.12n-r has a rational purpose. Plaintiffs fail to acknowledge the purpose set forth in N.J.S.A. 40:48-2.12n, to enable shore resort communities to maintain their "peace and tranquility" by taking "effective action to assure that excesses, when they occur, shall not be repeated." N.J.S.A. 40:48-2.12n.b, c.
The judge correctly held that N.J.S.A. 40:48-2.12n-r and Ordinance section 26-11 did not violate plaintiffs' right to substantive due process under the New Jersey Constitution.
Lastly, we reject as without merit plaintiffs additional arguments that the hearing officer had no meaningful criteria in making a determination to require a bond; that N.J.S.A. 40:48-2.12n-r was unconstitutional as special legislation; and that the hearing officer and judge erred in concluding that the statute required imposition of the bond. R. 2:11-3(e)(1)(E).
As to A-2938-99T5 and A-2941-99T5, we affirm in part and reverse in part; as to A-40-00T5, we affirm.
NOTES
[1] N.J.S.A. 40:52-1(n) authorizes municipalities to license and regulate the "rental of real property for a term less than 175 consecutive days for residential purposes by a person having a permanent place of residence elsewhere."
[2] Plaintiffs complain that the judge failed to "analyze this issue with respect to the relevant provisions of the New Jersey Administrative Code." Plaintiffs cite subsections of N.J.A.C. 5:18, but this chapter regulates liquified petroleum gas and does not apply to housing.
[3] We discuss the issue of the bond requirement more fully at Part XIV.
[4] "Familial status" is defined, in relevant part, as "one or more individuals (who have not attained the age of 18 years) being domiciled withโ(1) a parent or another person having legal custody of such individual or individuals." 42 U.S.C.A. ง 3602(k).
[5] 18 U.S.C.A. ง 922(q) was amended in 1996 to prohibit possession of a firearm "that has moved in or that otherwise affects interstate or foreign commerce" in a school zone. Id. at U.S.C.A. ง 922(q)(2)(A).
[6] The portion of the proposed affidavit referring to occupancy by more persons than permitted between 1:30 a.m. and 8:30 a.m. as a violation is also invalid because of our conclusion that the Ordinance provision violates tenants' rights to share their homes with guests in violation of their right to privacy. See supra, Part VII.
[7] The statute imposing liability on landlords for the disorderly conduct of their tenants, N.J.S.A. 40:48-2.12q was recently amended. L. 2001, c. 71. It relaxed the requirements for the commencement of a proceeding against the landlord, changing the one calendar-year period for substantiated complaints to twelve consecutive months, and reducing the minimum number of required complaints from three to two.